79 F.3d 932
 96 Cal. Daily Op. Serv. 2042, 96 Daily Journal
D.A.R. 3456
Pao YANG; Ying Yang; Jimmy Yang; Bao Yang; Seyar Yang;
Phonesavanne Yang, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 94-70439.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 7, 1995.
Decided March 27, 1996.
 
 Donald L. Ungar, Simmons, Ungar, Helbush, Steinberg & Bright, San Francisco, California, for petitioners.
 Alison R. Drucker and Patricia Connally, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for respondent.
 Petition to Review a Decision of the Immigration and Naturalization Service.
 Before: BROWNING, CANBY and HALL, Circuit Judges.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 The petitioners were denied asylum in the United States under a regulation which categorically precludes asylum for refugees who have "firmly resettled" in another country. See 8 C.F.R. § 208.14(c)(2) (1994).[1] They argue that the regulation is ultra vires, and ask us to remand their cause to the Immigration and Naturalization Service ("INS") for consideration on the merits. We have jurisdiction over this timely appeal pursuant to 8 U.S.C. § 1105a(a). Finding that the regulation does not violate its enabling statute, we deny the petition.
 
 
 2
 * The petitioners are a Hmong family from Laos. They claim that during the Vietnam War, members of their family cooperated with the American military and CIA against the communists. In return, they say, they received promises of asylum in the United States.
 
 
 3
 When the Pathet Lao came to power in Laos in 1975, petitioner Pao Yang, his wife Ying, and others of their extended family fled to Thailand. They claim that they immediately sought passage to the United States, but that the American government denied their request for asylum. For three years the family remained in a Thai refugee camp, until the French government offered them admission to France as refugees. The Yangs accepted the French offer, they say, because Thai authorities threatened them with deportation to Laos if they refused.
 
 
 4
 Pao and Ying Yang thus took refuge in France, where they remained for fourteen years and had four children, who are also petitioners in this case. In spite of this long period of residence in France, the BIA determined that under French law the family remained foreign refugees rather than French citizens or permanent residents. It is unclear whether the Yangs either applied or became eligible for permanent residence in France. In any event, they maintain that they never intended to remain in France. Pao Yang attests that the family considered France merely a stopping point on their way to the United States, but that the French government refused them travel documentation until 1991. Once they obtained their documents, the parents came to the United States as visitors. The children followed.
 
 
 5
 The Yangs overstayed their visas, and the INS ordered them to show cause. On January 28, 1994, an immigration judge ("IJ") found them deportable under section 241(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1251(a)(1)(B). In reviewing their application for asylum under section 208 of the INA, 8 U.S.C. §§ 1158(a), (c), the IJ determined that the Yangs were ineligible for relief under the accompanying regulations, which deny asylum to applicants who have "firmly resettled" in a third country. See 8 C.F.R. §§ 208.14(c)(2) (denying asylum to applicants firmly resettled), 208.15 (defining "firmly resettled").
 
 
 6
 The Yangs conceded arguendo that they were at one time firmly resettled in France, but denied that they necessarily retained the right under French law to return to France. Furthermore, returning to Laos was not an option. According to an INS report, the Yangs faced continuing threats to "life or freedom" in Laos. On the basis of this advice, the IJ withheld the family's deportation to Laos under section 243(h) of the INA, 8 U.S.C. § 1253(h), and designated France as the family's destination of deportation or, in the alternative, voluntary departure.
 
 
 7
 The Yangs appealed to the Board of Immigration Appeals ("BIA") solely on the basis that regulation 208.14(c)(2) was ultra vires. The BIA summarily dismissed the appeal on June 28, 1994. The Yangs renew the claim on appeal to this court. We review de novo the BIA's determination of this purely legal question regarding the requirements of the Immigration and Nationality Act. Ghaly v. INS, 58 F.3d 1425, 1429 (9th Cir.1995).
 
 II
 
 8
 Under INS regulation 208.14(c)(2), the finding that an alien has "firmly resettled" in a third country prior to his or her arrival in the United States bars that alien's eligibility for asylum. 8 C.F.R. § 208.14(c)(2). The question presented in this case is whether this regulation violates its enabling statute, section 208 of the INA, 8 U.S.C. § 1158(a),[2] which permits the Attorney General to grant asylum as a matter of discretion.
 
 
 9
 Section 208 gives the Attorney General discretion to grant asylum to aliens who meet a statutory definition of eligibility. In practice this decision is delegated to the INS, see Patel v. INS, 638 F.2d 1199, 1201 n. 1 (9th Cir.1980), which considers asylum applications in two stages. See Kazlauskas v. INS, 46 F.3d 902, 905 (9th Cir.1995) (describing two-stage procedure). At the first stage, the INS inquires into eligibility. An alien is eligible if he or she is determined to be a "refugee" within the meaning of INA section 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).[3] A finding of eligibility merely entitles the alien to submit an application for asylum; it does not guarantee that asylum will be granted.
 
 
 10
 At the second stage, the INS makes a discretionary decision on the application. Section 208 does not explicitly limit or structure this exercise of discretion, except to disqualify any alien "convicted of an aggravated felony." 8 U.S.C. § 1158(d).[4] It states only that "an [eligible] alien may be granted asylum in the discretion of the Attorney General." 8 U.S.C. § 1158(a) (emphasis added). As we have previously noted, this language amounts to a "broad delegation of power" to the Attorney General. Komarenko v. INS, 35 F.3d 432, 436 (9th Cir.1994).
 
 
 11
 The question before us is whether the INS may exercise this discretion by creating a rule that automatically excludes a particular class of applicants. Under the INS regulations in effect until October 1, 1990, the INS was to evaluate an asylum application by weighing against each other a number of equitable factors. Matter of Pula, 19 I. & N. Dec. 467, 473-74 (BIA 1987) (listing the factors to be considered for grant of asylum); Kazlauskas, 46 F.3d at 906 (approving and applying the Pula standards). These factors had no fixed weight, but were to be taken together and viewed in the "totality of the circumstances." Pula, 19 I. & N. Dec. at 474. The October 1990 regulations, which are at issue in this appeal, follow the Pula approach, but add to the calculus categorical bars to asylum for aliens in three categories,[5] one of which covers aliens "firmly resettled" in a third country. 8 C.F.R. § 208.14(c)(2). Under the new regulation, a finding of firm resettlement trumps any other equities in the applicant's favor. The Yangs argue that this rule contravenes the INA by precluding the INS from exercising its discretion in individual cases.
 
 
 12
 We must reject the argument that regulation 208.14(c)(2) exceeds the authority of the Attorney General if we find that the regulation has a "reasonable foundation ... that is, if it rationally pursues a purpose that it is lawful for the INS to seek." Reno v. Flores, 507 U.S. 292, 309, 113 S.Ct. 1439, 1451, 123 L.Ed.2d 1 (1993) (citing Carlson v. Landon, 342 U.S. 524, 541, 72 S.Ct. 525, 534-35, 96 L.Ed. 547 (1952)) (internal quotations omitted). Following the doctrine announced in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must first consider "whether Congress has directly spoken to the precise question at issue." Id. at 842-43, 104 S.Ct. at 2781. Thus we begin with traditional methods of statutory interpretation. If it then appears that Congress has been silent with respect to the specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782. In the face of ambiguity or Congressional silence, we should defer to the agency's considered judgment. Id.; Van Blaricom v. Burlington N. Ry. Co., 17 F.3d 1224, 1225 (9th Cir.1994).
 
 
 13
 The language of section 208 is silent as to firm resettlement. As discussed above, it simply grants the Attorney General "discretion" to grant asylum to eligible aliens, subject only to an exception for aliens convicted of aggravated felonies. 8 U.S.C. § 1158(d). The Yangs contend, first, that this mandate to exercise discretion precludes the agency's giving conclusive weight to a single factor, such as firm resettlement. In their view, Congress envisaged this "discretion" as something like an individualized accounting of every equity that bears on a particular application. We reject this argument for two reasons.
 
 
 14
 First, the Yangs mistakenly presume that the equitable factors announced in Pula are themselves statutorily mandatory, and reflect a Congressional determination that these factors must be considered in any exercise of "discretion" under section 208. This is false. The Pula factors were not dictated by the INA, but were created judicially by the BIA. The INS is, presumably, free to alter or amend them, provided it does so in a manner consistent with the text and purposes of the INA, and without otherwise running afoul of the "arbitrary and capricious" standard set out in section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Regulation 208.14(c)(2) may or may not conflict with Pula;[6] this is irrelevant because both are instruments of delegated discretion.
 
 
 15
 Second, it is a well-established principle of administrative law that an agency to whom Congress grants discretion may elect between rulemaking and ad hoc adjudication to carry out its mandate. American Hosp. Ass'n v. NLRB, 499 U.S. 606, 611-13, 111 S.Ct. 1539, 1543, 113 L.Ed.2d 675 (1991); NLRB v. Bell Aerospace Co., 416 U.S. 267, 294, 94 S.Ct. 1757, 1771-72, 40 L.Ed.2d 134 (1974). As the Supreme Court has stated, "even if a statutory scheme requires individualized determinations, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." American Hosp., 499 U.S. at 612, 111 S.Ct. at 1543. Thus, in American Hospital, the Court permitted the NLRB to promulgate a rule even though the underlying statute, which instructed the agency to make a particularized decision "in each case," suggested a Congressional preference for ad hoc adjudication over rulemaking. Id. at 609-11, 111 S.Ct. at 1542.
 
 
 16
 Under the INA, the term "discretion" does not supplant this general grant of permission for rulemaking. In Reno, the Supreme Court upheld an INS regulation in circumstances similar to those before us. The respondents were a class of alien juveniles who had been taken into INS custody pending their deportation hearings. 507 U.S. at 293-95, 113 S.Ct. at 1443. Custody was intended to secure their appearance before the INS, and to ensure their safety. Id. at 295-97, 113 S.Ct. at 1444. The governing statute, however, permitted the Attorney General "in [her] discretion" to release such aliens into the custody of responsible citizens. Id. at 293-95, 113 S.Ct. at 1443; 8 U.S.C. § 1252(a)(1) (1993). The contested regulation was promulgated as an exercise of this discretion. It set out a rule which, in essence, allowed juvenile detainees to be released only to members of their families. Id. at 295-97, 113 S.Ct. at 1444. The respondents argued, among other things, that this regulation exceeded the authority of the Attorney General; they contended that under the INA, juveniles should also have the option to be released to other "responsible adults" unrelated to them. Id.
 
 
 17
 The Supreme Court rejected this argument and upheld the regulation. It held that a " 'blanket' presumption of the unsuitability of [unrelated] custodians" was not inconsistent with an exercise of discretion under section 1252(a)(1). Id. at 312-14, 113 S.Ct. at 1453. Although discretion under the statute required "some level of individualized determination ... this [did] not mean that the Service must forswear use of reasonable presumptions and generic rules." Id. (quoting INS v. National Center for Immigrants' Rights, 502 U.S. 183, 193-96, 112 S.Ct. 551, 558-59, 116 L.Ed.2d 546 (1991)) (quotation marks omitted). Under this analysis, an exercise of discretion would be sufficiently "individualized" if the INS applied its regulation fairly in individual cases, by individually determining whether each alien would be eligible for the prescribed relief. Id. In the present case, this standard is clearly met. The Yangs appeared before an IJ and conceded their firm resettlement in France. There can be no question that the regulation determined the outcome of the Yangs' application.
 
 
 18
 Recently this court considered and upheld a companion provision to the regulation now at issue. In Komarenko, 35 F.3d 432, we held that regulation 208.14(c)(1) did not exceed the authority of the Attorney General under section 1158(a). The regulation categorically barred asylum for any alien convicted of a "particularly serious crime." Id. at 436. We found the regulatory bar to be consistent with the discretionary mandate of the statute, both because the statute did not explicitly address the specific issue, and because the INS would be required under the regulation "to exercise individualized discretion in determining whether a particular offense should be counted as 'particularly serious.' " Id. Komarenko thus stands for the proposition that "discretion" under section 1158(a) may be exercised by rules giving fixed weight to a particular factor.
 
 
 19
 This, however, does not conclude our inquiry under Chevron 's first prong. The Yangs offer an independent textualist argument to support their conclusion that the regulation is ultra vires. They read INA section 208 together with sections 207 and 209, all three of which were added to the INA enacted by the Refugee Act of 1980. Refugee Act of 1980, Pub.L. No. 96-212, § 201(b), 94 Stat. 102 (1980), codified as amended at 8 U.S.C. §§ 1157-1159.[7] They note that while all three of these sections establish procedures relating to refuge and asylum, sections 207 and 209 explicitly bar applications from firmly resettled aliens where section 208 does not. As the Supreme Court has said elsewhere in the course of interpreting provisions of the Refugee Act, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." INS v. Cardoza-Fonseca, 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) (citing Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300-01, 78 L.Ed.2d 17 (1983)) (internal quotation marks omitted).
 
 
 20
 However, we find important differences between the present statutory provisions and those discussed in Cardoza-Fonseca. In that case the Supreme Court compared the standards of proof in INA sections 243(h) and 208. Section 243(h) required the Attorney General to withhold deportation for an alien whose "life or freedom would be threatened" in his or her native country. Section 208 gave the attorney discretion to grant asylum to an alien who showed a "well-founded fear" of persecution. The two statutes clearly deployed different and incompatible language to describe their standards of proof. However, the government wished to avoid certain "anomalous" results of having two separate standards of proof in asylum cases. It therefore advised the Court to hold that the same standard of proof applied under both sections. 480 U.S. at 430, 107 S.Ct. at 1212. The Court disagreed. It reasoned that whereas section 208 expressed both subjective ("fear") and objective ("well-founded") components, section 243(h) described a purely objective inquiry. 480 U.S. at 430-31, 107 S.Ct. at 1212-13. The Court concluded that by omitting the word fear from the language of section 243(h), and including it in section 208, Congress meant to express its intention that the two standards of proof should differ. Id. at 432, 107 S.Ct. at 1213.
 
 
 21
 The present case is not governed by Cardoza-Fonseca because the statutory provisions before us present no comparable inconsistency. Section 207 establishes the procedure by which an alien not present in the United States may apply for entry as a refugee. 8 U.S.C. 1157(c)(1). It gives the Attorney General discretion to admit any refugee who is "not firmly resettled in any foreign country" and who is "determined to be of special humanitarian concern." Id. Unlike section 208, it does not exclude serious felons. Section 208, on the other hand, sets out procedures for granting asylum to refugees within the United States. As discussed above, it grants the Attorney General discretion without mentioning firm resettlement or special humanitarian concern, but with an explicit exclusion for certain felons. The plain meaning of these two sections read together is that the Attorney General may not admit firmly resettled refugees if they apply from abroad, but may choose whether to grant them asylum if they manage to apply from within the United States. Because regulation 208.14(c)(2) represents just such a choice, it appears to be consistent with the grant of discretion described in section 208.
 
 
 22
 To hold otherwise would improperly constrain the statutory discretion of the Attorney General. The Yangs' "deliberate exclusion" argument clearly justifies too much; their reasoning suggests that the mention of felons in section 208 precludes an INS rule barring felons under section 207. Likewise, section 207 directs the Attorney General to admit refugees of "special humanitarian concern;" surely this does not prohibit humanitarian concerns from underpinning the regulations written under the authority of section 208.
 
 
 23
 Against this conclusion, the Yangs argue that firm resettlement appeared in section 207 but not in 208 because Congress intended to favor applicants already present in the United States. They contend that this policy is evident in other provisions of the INA, which, for example, allow aliens illegally present in the United States to win suspension of deportation, registry, or amnesty--privileges unavailable to aliens who remain in their homelands. See 8 U.S.C. §§ 1160, 1254, 1255a and 1259. This argument is plausible. But like the Supreme Court in Reno, 507 U.S. at 312 n. 8, 113 S.Ct. at 1453 n. 8, we think it preferable to divine Congressional intent from the statute in issue before we look elsewhere for indications of the applicable policy. According to section 208, Congress intended to permit the Attorney General to decide how best to address the question what weight to attribute to firm resettlement in the asylum process with respect to aliens present in the United States. Furthermore, we think the regulation makes reasonable sense, for reasons we discuss below.
 
 
 24
 The second half of the Yangs' textualist attack upon the regulation focuses on the relationship between sections 208 and 209. Here again, the analogy with Cardoza-Fonseca is inapt. Section 209 permits a section 208 asylee to become a "permanent resident" after one year of physical presence in the United States, provided the alien is not firmly resettled in another country. 8 U.S.C. § 1159(b); 8 C.F.R. § 209.2(a)(iv) (1994). As the Yangs rightly point out, section 209 thus contemplates that an alien may have been granted asylum under section 208 even though he or she had firmly resettled elsewhere. Yet under the regulation a firmly resettled alien would never have been granted asylum. Therefore, they argue, regulation 208.14(c)(2) renders the firm resettlement provision of section 209 superfluous. Be this as it may, we again find no inconsistency. Section 209 clearly allows for the possibility that the Attorney General might grant asylum to a firmly resettled alien. However, it does not demand that she do so. Section 209 is pointedly silent with respect to how the Attorney General should exercise her discretionary power under section 208.
 
 
 25
 Thus we conclude our inquiry under Chevron 's first prong: Congress has been silent on the relevance of firm resettlement to asylum applications under section 208. Moving on to Chevron 's second prong, we must now ask whether regulation 208.14(c)(2) reflects a permissible construction of the statute. There can be no question that it does. In Rosenberg v. Yee Chien Woo, 402 U.S. 49, 91 S.Ct. 1312, 28 L.Ed.2d 592 (1971), the Supreme Court held that the INS must take firm resettlement into account in determining whether an applicant met the statutory definition of a refugee. Id. at 54-55, 91 S.Ct. at 1316 (citing "the central theme of all 23 years of refugee legislation-the creation of a haven for the world's homeless people"). Firm resettlement has long been a decisive factor in asylum policy. Even before the regulation was promulgated in 1990, firm resettlement seems to have precluded a grant of asylum in practice. See Matter of Soleimani, Int. Dec. 3118 (observing that "a finding that an alien has firmly resettled in a third country would normally preclude a grant of asylum as a matter of discretion").
 
 
 26
 Nothing in the Refugee Act or its legislative history alters the long-standing significance of firm resettlement to the asylum process. The stated purpose of the Act
 
 
 27
 declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands.... The Congress further declares that it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible.
 
 
 28
 ... The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.
 
 
 29
 Refugee Act of 1980, § 101. Regulation 208.14(c)(2) is fully consistent with these aims. Congress intended to give relief to individuals "subject to persecution in their homelands." Because firmly resettled aliens are by definition no longer subject to persecution, the regulation creates no conflict with this aim. Moreover, the regulation seems directly to "encourage" other nations "to provide assistance and resettlement." Finally, to the extent that the Act's purposes are procedural, the regulation does not impede them.[8]
 
 
 30
 Furthermore, we cannot say that regulation 208.14(c)(2) represents an unreasonable exercise of the Attorney General's discretion. Without this regulation, a firmly resettled alien living abroad might circumvent section 207 by coming illegally to the United States and applying under section 208. Congress need not have foreseen the "bootstrapping" problem for this rationale to support the regulation; it is precisely to cope with the unexpected that Congress deferred to the experience and expertise of the Attorney General in fashioning section 208. Regulation 208.14(c)(2) effectively harmonizes sections 207 and 208 by closing a loophole incentive to illegal immigration. See also Abdalla v. INS, 43 F.3d 1397, 1400 (10th Cir.1994) (Regulation 208.14(c)(2) "preclude[s] a deportable alien from bootstrapping an asylum claim simply by unilaterally severing his existing ties to a third country....").
 
 III
 
 31
 Because we find that regulation 208.14(c)(2) contravenes neither the letter nor the spirit of its enabling statute, the petition is DENIED.
 
 
 
 [1]
 The regulation is now found at 8 C.F.R. § 208.14(d)(2) (1995)
 
 
 [2]
 Section 208 of the INA, 8 U.S.C. § 1158 states, in pertinent part:
 Asylum procedure
 (a) Establishment by Attorney General; coverage
 The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title....
 (c) Status of spouse or child of alien granted asylum
 A spouse or child ... of an alien who is granted asylum under subsection (a) may ... be granted the same status....
 
 
 [3]
 Title 8, section 1101 states, in pertinent part:
 Definitions (a) As used in this chapter--
 ...
 (42) The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....
 
 
 [4]
 This provision was enacted in 1990 as an amendment to the INA. Immigration Act of 1990, Pub.L. No. 101-649, § 501(a)(2), 104 Stat. 4978, 5048 (1990). Before 1990, section 208 placed no explicit limits on the Attorney General's discretion
 
 
 [5]
 The regulation states, in pertinent part:
 (c) Mandatory denials. An application for asylum shall be denied if:
 (1) The alien, having been convicted ... of a particularly serious crime in the United States, constitutes a danger to the community;
 (2) The applicant has been firmly resettled within the meaning of § 208.15; or
 (3) There are reasonable grounds for regarding the alien as a danger to the security of the United States.
 
 
 [8]
 C.F.R. 208.14
 
 
 [6]
 We note that the BIA itself addressed the relationship between the Pula factors and section 208 in a case which arose before the promulgation of regulation 208.14(c)(2). In Matter of Soleimani, 20 I. & N. Dec. ----, Int. Dec. 3118 (BIA 1989), the BIA stated that only "in the absence of any regulatory bar" would firm resettlement be treated as one factor of relevance to be weighed against others. This dictum implies that the BIA regarded Pula only as an attempt to fill a gap left in INS regulations. We think that the regulation at issue represents the agency's effort to fill this gap
 
 
 [7]
 Section 207 states, in pertinent part:
 Annual admission of refugees and admission of emergency situation refugees
 ...
 (c) Admission by Attorney General of refugees; criteria; admission status of spouse or child; applicability of other statutory requirements; termination of refugee status ...
 (1) Subject to the numerical limitations [above], the Attorney General may, in [her] discretion and pursuant to such regulations as [she] may prescribe, admit any refugee who is not firmly resettled in any foreign country ...
 8 U.S.C. § 1157 (emphasis added).
 Section 209 states, in pertinent part:
 Adjustment of status of refugees
 ...
 (b) Maximum number of adjustments; recordkeeping
 Not more than 10,000 of the refugee admissions authorized under section 1157(a) of this title in any fiscal year may be made available ... to adjust the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who--
 ...
 (2) has been physically present in the United States for at least one year ...
 (3) continues to be a refugee ...
 (4) is not firmly resettled in any foreign country ...
 8 U.S.C. § 1159 (emphasis added).
 
 
 [8]
 The legislative history contains no discussion as to why Congress chose not to mention firm resettlement in section 208. See S.Rep. No. 256, 96th Cong., 2d Sess., reprinted in 1980 U.S.C.C.A.N. 141; H.R. Conf. Rep. No. 781, 96th Cong., 2d Sess., reprinted in 1980 U.S.C.C.A.N. 160. We also note that the INS offered no explanation for the firm resettlement bar in promulgating the regulations, nor did outside commentators appear to bring the issue to their attention. See 55 Fed.Reg. 30,674-79 (1990); 53 Fed.Reg. 11,300, 11,306 (1988); see also 52 Fed.Reg. 32,552 (1987); 45 Fed.Reg. 37,392 (1980)