**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ABDI ASIS ALI ADEN,<br>*Petitioner*, | No. 17-71313 |
| v. | Agency No.<br>A208-307-454 |
| ROBERT M. WILKINSON, Acting<br>Attorney General,<br>*Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted November 6, 2019[*]
Portland, Oregon

Filed March 4, 2021

Before: Richard A. Paez and Johnnie B. Rawlinson,
Circuit Judges, and George H. Wu,[**] District Judge.

Opinion by Judge Paez;
Concurrence by Judge Rawlinson

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable George H. Wu, United States District Judge for the Central District of California, sitting by designation.

## SUMMARY***

### Immigration

Granting Abdi Ali Asis Aden's petition for review of the Board of Immigration Appeals' dismissal of his appeal of an Immigration Judge's denial of his applications for asylum and withholding of removal from Somalia, and remanding, the panel held that the Board erred in concluding that Aden did not qualify for an exception to the firm resettlement bar, and that the evidence compelled the conclusion that he suffered past persecution in Somalia on account of a protected ground.

Aden asserted that he suffered persecution in Somalia by members of Al-Shabaab, a militant terrorist organization affiliated with Al-Qaeda and the Islamic State, after his brother refused their orders to shut down his theater showing American and Hindi movies and sports, which Al-Shabaab viewed as "Satanic" movies. The Board concluded that Aden was ineligible for asylum because he was firmly resettled in South Africa, and that he failed to establish that he suffered past persecution in Somalia on account of a protected ground.

The Board noted that Aden presented "ample evidence" of persecution in South Africa, but nonetheless determined that he failed to qualify for the restricted-residence exception to the firm resettlement bar because the persecution he faced was at the hands of private individuals, rather than the South

---

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

African government. The panel concluded that the Board erred in doing do, holding that the restricted-residence exception applies when the country's authorities are unable or unwilling to protect the applicant from persecution by nongovernment actors.

The panel held that the evidence compelled the conclusion that Aden suffered past persecution in Somalia, where in addition to physically beating Aden, members of Al-Shabaab kept tabs on him by contacting his brother and warned they would kill Aden and his brother if they continued to disobey Al-Shabaab's command to close their theater. The panel wrote that the chain of events revealed that Al-Shabaab intended to coerce Aden to submit to its new political and religious order, and used offensive strategies— beatings, destruction of property, and death threats—to achieve this goal. Further, the panel explained that continuing political and social turmoil caused by Al-Shabaab provided context for the harm and death threats that Aden experienced, which together with the past harm, compelled the conclusion that he suffered past persecution in Somalia.

The panel held that substantial evidence did not support the Board's determination that Aden failed to establish that he was targeted on account of a protected ground because Al Shabaab was motived by their own political and religious beliefs, rather than Aden's. The panel explained that Al-Shabaab's accusation that the brothers were featuring Islamically forbidden, "Satanic" films provided direct evidence of their political and religious motive, and that even if the brothers did not feature the films out of their own political or religious convictions, Al-Shabaab at the very least imputed those beliefs to them. The panel wrote that the only logical explanation for Al-Shabaab's treatment of Aden

and his brother was that their actions were subversive to Al-Shabaab's political and religious doctrine.

The panel remanded for the Board to consider, under the appropriate framework, whether Aden was firmly resettled in South Africa, and to give the government an opportunity to rebut the presumption of future persecution triggered by Aden's showing of past persecution on account of a protected ground.

Concurring, Judge Rawlinson agreed that the case should be remanded for reconsideration of the firm resettlement issue. Judge Rawlinson noted that despite the fact that the IJ never addressed the issue of whether persecution by private actors may prevent application of the firm resettlement bar, the Board concluded that the firm resettlement bar applied to Aden because he did not introduce any evidence that the South African government imposed any restrictions on his residency such that the restricted-residence exception applied. Judge Rawlinson wrote that the Board's conclusion was not supported by substantial evidence in the record, as reflected in the IJ's factual findings. Judge Rawlinson also agreed that the Board erred in concluding that Aden failed to establish a nexus to a protected ground because, based on binding precedent, an applicant such as Aden, who disagrees with Al Shabaab's view of the proper interpretation of Islam, can establish persecution on account of a protected ground by showing that others in his group persecuted him because they found him insufficiently loyal or authentic to the religious ideal they espouse.

**COUNSEL**

Emery El Habiby, El Habiby Law Firm, Sun City, Arizona, for Petitioner.

Stephen J. Flynn, Assistant Director; Lynda A. Do, Attorney; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

PAEZ, Circuit Judge:

Abdi Ali Asis Aden petitions for review of the Board of Immigration Appeals' (the "BIA" or "Board") dismissal of his appeal of an Immigration Judge's ("IJ") denial of his applications for asylum and withholding of removal from Somalia. Aden challenges the Board's determination that he firmly resettled in South Africa and did not experience persecution in Somalia. We have jurisdiction under 8 U.S.C. § 1252. We grant the petition for review and remand.

## I. Factual and Procedural Background[1]

Aden is a native and citizen of Somalia. He was born in Beledweyne, Somalia, and practices a form of Islamic mysticism known as Sufism. He contends he suffered persecution under Al-Shabaab, a militant terrorist organization affiliated with Al-Qaeda and the Islamic State, which took control of Beledweyne. The group maintained

---

[1] The factual background is drawn from the IJ's decision and Aden's credible testimony at his merits hearing.

an active presence in the area surrounding Beledweyne and much of southern Somalia.

After graduating high school, Aden began to work in a nearby theater owned by his brother. The theater featured American and Hindi movies and sports. On two occasions in late 2010, members of Al-Shabaab visited the theater and ordered Aden's brother to shut down the theater and stop screening, in their view, "Satanic" movies. Aden was not present during these encounters, but his brother later told him about them.

The brothers did not heed the instructions. A month later, ten armed members of Al-Shabaab raided the theater while Aden and his brother were working. For the next twenty minutes, the armed men beat the theater employees and patrons with sticks. After the patrons fled, the raiders turned their attention to the remaining workers, including Aden and his brother. They struck Aden in the head with the butt of a rifle, causing him to bleed profusely. When they left, they confiscated the equipment used to screen the movies.

Immediately after the incident, Aden and his brother hid in their uncle's house in Beledweyne. Two weeks later, members of Al-Shabaab contacted Aden's brother and warned him that if he reopened the theater, they would kill both him and Aden. Aden and his brother did not reopen the theater, deciding instead to hide at their uncle's house until they gathered enough money to escape Somalia.

In January 2011, Aden fled Somalia and, over the next two months, made his way to South Africa. Upon his arrival, he was granted asylum and given permission to work. He worked and lived in a store owned by his cousin. To

maintain legal status, he needed to renew his asylum documentation several times.

Aden spent four difficult years in South Africa. He testified about three incidents in which he was the target of xenophobic attacks directed at Somali immigrants. In December 2012, a group of anti-immigrant protestors entered the store in which he worked, beat him with wooden sticks and other tools, and broke and stole merchandise. Once they finished ransacking, the protestors set fire to the store, requiring it to be rebuilt.

The second incident occurred one night in March 2013. Aden was sleeping inside the store with his cousin. He woke up to a noise and found three to four men had broken into the store. The intruders beat Aden and his cousin with wooden sticks, forced them to lie on the ground, and stole money and phone cards. During the incident, the men accused Aden of being an "illegal alien" and told him he had "no right to this business." Aden reported the incident to South African law enforcement, but they did nothing to follow up or investigate.

The third and final incident took place in December 2014. While Aden was working, two men brandishing guns went to the store and threatened to kill him. Aden gave them money, phones, and phone cards. They told him, "you are Somalis [and] [y]ou do not have rights to . . . this country, and you don't have . . . rights to enter." Aden reported this incident to the South African police but, again, they did nothing to follow up or investigate.

As a result of these incidents, Aden fled yet again in 2015. He managed to travel to the United States, and upon arriving at the San Ysidro port of entry he applied for asylum, withholding of removal from Somalia and South

Africa, and protection under the Convention Against
Torture.

The IJ denied Aden's applications for relief and found
him removable as charged.  Although the IJ found Aden
credible, he concluded that Aden was ineligible for asylum
because he had "firmly resettled" in South Africa.  In
reaching this conclusion, the IJ first determined that Aden
had been offered permanent resettlement because he had no
difficulty finding work or a place to reside, received refugee
status and, after a certain amount of time, could have sought
a permanent immigration permit.  Further, the IJ determined
Aden did not qualify for an exception to the firm-
resettlement bar because, in part, he did not show that the
conditions of his residence were too restricted for him to be
firmly resettled.  In determining that Aden had firmly
resettled, the IJ did not discuss or consider Aden's claims of
persecution as a Somali refugee by native South Africans.[2]

The IJ alternatively determined that Aden was ineligible
for asylum in the United States because he did not establish
that, while in Somalia, he experienced past persecution or
that he had a well-founded fear of future persecution on
account of a protected ground.  In reaching this
determination, the IJ reasoned that the "one-time" beating at
the theater did not amount to persecution, and, even if it did,
Aden failed to show it was on account of his religion or
political opinion.  Further, the IJ concluded that because the
movie theater no longer existed in Somalia, Aden failed to
establish he had a well-founded fear of future persecution.
The IJ also found that Al-Shabaab remained a major force in

---

[2] The IJ did, however, determine that Aden was entitled to
withholding of removal from South Africa on the basis of past
persecution, as discussed below.

Somalia and a danger to many, including in the region Aden is from, but ultimately concluded it was insufficient to demonstrate Aden had a well-founded fear of persecution because it amounted only to "general strife and violence in Somalia." Accordingly, the IJ denied Aden's request for withholding of removal from Somalia.

The IJ did, however, conclude that Aden was eligible for withholding of removal from South Africa because the harm Aden faced rose to the level of persecution. In making this determination, the IJ pointed to the three xenophobic incidents about which Aden testified, found that the incidents occurred on account of his nationality as a Somali immigrant, and determined that the South African government was unable or unwilling to control such violence. Last, the IJ determined that the government failed to rebut the presumption of Aden's well-founded fear of persecution in South Africa by showing that he could relocate internally or that the conditions there had changed.

Aden appealed the IJ's decision to the BIA. The Board agreed that Aden presented "ample evidence" that he suffered persecution in South Africa, but nonetheless upheld the IJ's conclusion that Aden firmly resettled there. The Board stated that Aden did not qualify for a firm-resettlement exception because he was persecuted by nongovernment actors. The Board also upheld the IJ's ruling that Aden was ineligible for asylum from Somalia because he did not demonstrate past persecution or a well-founded fear of future persecution on account of a protected ground. In light of that conclusion, the Board also upheld the IJ's denial of Aden's application for withholding of removal from Somalia.

Aden timely petitioned for review of the Board's determination that he firmly resettled in South Africa and was not persecuted in Somalia.

## II.  Standard of Review

We examine the Board's "legal conclusions de novo and its factual findings for substantial evidence." *Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019) (citation omitted).  A factual finding is "not supported by substantial evidence when any reasonable adjudicator would be compelled to conclude to the contrary based on the evidence in the record." *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059 (9th Cir. 2017) (en banc) (citation and quotation marks omitted).

## III.  Firm Resettlement

An applicant who is firmly resettled is ineligible for asylum.  8 U.S.C. § 1158(b)(2)(A)(vi).  The IJ concluded, and the Board agreed, that Aden did not qualify for asylum because he had firmly resettled in South Africa and did not meet an exception to the firm-resettlement bar.  Aden argues the Board erred in concluding he is not eligible for an exception to the firm-resettlement bar.  We agree.

To determine whether substantial evidence supports the agency's finding that an applicant has not firmly resettled in a third country, we first determine whether the government presented evidence that the applicant received an offer of permanent resettlement.  *Arrey*, 916 F.3d at 1159 (citing *Maharaj v. Gonzales*, 450 F.3d 961, 976–77 (9th Cir. 2006) (en banc)); 8 C.F.R. § 208.15.  If the government establishes that an applicant has firmly resettled, we then look to whether the applicant qualifies for either of two exceptions to the firm-resettlement bar.  *Arrey*, 916 F.3d at 1159.  One

such exception—what we refer to as the "restricted-residence exception"—applies when the applicant "show[s] that . . . the conditions of [the applicant's] residence [were] too restricted[] for [the applicant] to be firmly resettled." *Id.* (quoting *Maharaj*, 450 F.3d at 976–77); 8 C.F.R. § 208.15(b).[3]  The regulation provides that the restricted-residence exception applies when the applicant shows that the living restriction was (1) "substantial[]," (2) "conscious[]," and (3) "by" the country's authorities. 8 C.F.R. § 208.15(b).  In making this determination, courts consider the conditions under which other residents of the country live, the type of housing offered to the applicant, and the extent to which the applicant enjoyed privileges like employment or education.  *See id.*

Aden argues he qualifies for the restricted-residence exception to the firm-resettlement bar because the persecution he suffered in South Africa sufficiently restricted his living conditions.  The IJ concluded that Aden had been persecuted in South Africa because of his status as a Somali immigrant and was thus entitled to withholding of removal from South Africa.  The Board likewise agreed that Aden presented "ample evidence" of persecution in South Africa, but nonetheless determined he failed to qualify for the restricted-residence exception because the persecution he faced was at the hands of *private* individuals, rather than the South African government.

The key question here is thus whether the restricted-residence exception applies when the country's authorities are unable or unwilling to protect the applicant from

---

[3] The other recognized exception—whether the applicant remained in the country "only as long as was necessary to arrange onward travel," § 208.15(a)—is not at issue here.

persecution by nongovernment actors.  *See* 8 C.F.R. § 208.15(b).  We conclude it does, and the Board legally erred in deciding otherwise.

First, there is no doubt that persecution is a "substantial[]" restriction of one's residence.  *See Arrey*, 916 F.3d at 1159–60; *Siong v. INS*, 376 F.3d 1030, 1040 (9th Cir. 2004); *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 847 (9th Cir. 2020).  As we have recognized, the firm-resettlement bar ensures that "if [the United States] denies a refugee asylum, the refugee will not be forced to return to a land where he would once again become a victim of harm or persecution."  *E. Bay Sanctuary Covenant*, 964 F.3d at 847 (quoting *Andriasian v. INS*, 180 F.3d 1033, 1046–47 (9th Cir. 1999)).  Such an outcome, we have explained, "would totally undermine the humanitarian policy underlying the regulation."  *Id.* (quoting *Andriasian*, 180 F.3d at 1046–47).  Indeed, "[t]he regulatory definition of firm resettlement captures the oft-repeated understanding that asylum is not granted to aliens who have found a haven from persecution."  *Siong*, 376 F.3d at 1040 (quoting *Ali v. Reno*, 237 F.3d 591, 595 (6th Cir. 2001)).

Second, a restriction is "conscious[]" if the persecutors act knowingly.[4]  No one contests—either here or before the agency—that Aden's persecutors acted knowingly.

The only remaining issue is thus whether a government's failure or unwillingness to protect a person from private persecution is a restriction "by" the country's authorities.

---

[4] To be "conscious" means simply to "hav[e] awareness" or "knowledge."  *Conscious*, Oxford English Dictionary (3d ed. 2011), https://www.oed.com/view/Entry/39475?redirectedFrom=conscious& (last visited Dec. 4, 2020).

Our precedent recognizes that it is. In *Siong*, we evaluated the BIA's denial of an asylum applicant's motion to reopen his case on the ground that he had received ineffective assistance of counsel in his removal proceeding. 376 F.3d at 1036–42. Part of that inquiry required the court to determine whether the petitioner had demonstrated prejudice, which, in turn, required a further determination of whether he had alleged a "plausible" ground for relief. *Id.* at 1037–42. The IJ concluded, and the Board agreed, that the petitioner had firmly resettled in France. *Id.* at 1038.

The petitioner argued that he qualified for the restricted-residence exception to the firm-resettlement bar because of persecution he suffered in France. Although the persecutors were private actors, rather than government officials, we concluded the petitioner had established "at least a plausible claim" that he had not firmly resettled in France. *Id.* at 1140. In reaching that conclusion, we relied on the straightforward principle that "firmly resettled aliens are by definition no longer subject to persecution." *Id.* (quoting *Yang v. INS*, 79 F.3d 932, 939 (9th Cir. 1996)).

We applied the same principle in *Arrey*. The petitioner in that case, a Cameroonian woman, had fled her home country to escape domestic violence and relocated to South Africa, where she received refugee status. 916 F.3d at 1154–55. In South Africa, however, the petitioner was robbed and stabbed, and her brother, also a South Africa resident, was shot and killed. *Id.* at 1155. The petitioner eventually fled to the United States and applied for asylum. *Id.* The IJ denied her application, in part, on the ground that she had firmly resettled in South Africa, and the Board agreed. *Id.* at 1155–57.

On appeal, we concluded the Board erred in applying the firm-resettlement bar. Although the Board conducted the

first step of the inquiry (whether the petitioner received an offer of permanent settlement), we concluded it erred by declining to conduct the second step (whether she qualified for an exception to the bar because she suffered persecution in South Africa). *Id.* at 1159. We explained the Board should have considered incidents alleging past persecution by nongovernmental actors, because "[t]hat evidence could rebut the finding of firm resettlement." *Id.* at 1159–60. We did not hesitate to reach this conclusion even though the alleged persecutors were nongovernment actors. *See id.* Once again, in reaching this conclusion, we relied on the well-established credendum that "firmly resettled aliens are by definition no longer subject to persecution." *Id.* at 1159–60 (quoting *Yang*, 79 F.3d at 939). We thus remanded to afford the Board an opportunity to conduct fully its firm-resettlement analysis in light of the petitioner's allegations of past persecution. *Id.* at 1160.

Given this precedent, we reaffirm that a government's failure to address persecution, despite knowing about it, constitutes a restriction of one's living conditions "by" the country's authorities. *See* § 208.15(b); *Arrey*, 916 F.3d at 1160; *Siong*, 376 F.3d at 1040; *Yang*, 79 F.3d at 939.[5] We

---

[5] This approach also comports with 8 C.F.R. § 208.15(b)'s requirement that courts consider the applicant's living conditions relative to those of "other residents"—a determination that necessarily requires consideration of what conditions the applicant *does not enjoy*. The same approach applies to other required considerations, such as determining what kind of housing or employment was "made available" to the refugee; these inquiries necessarily require a consideration of the housing and employment *not* made available to the refugee. Each example of what was *not* done or what was *not* made available—despite being examples of a government's failure to act, rather than an affirmative act—would still constitute a restriction on living "by" a country's authorities.

reach the same conclusion even when the persecutors are nongovernment actors, so long as the applicant also shows that the country's authorities were unable or unwilling to stop the persecution. Any other conclusion would be irreconcilable with the regulation's plain text and our precedent.

Thus, the Board erred by concluding that Aden did not qualify for a firm-resettlement exception because the persecution he suffered was perpetrated by nongovernment actors. On remand the Board should consider—now with the appropriate legal framework—whether he was firmly resettled in South Africa.[6]

## IV. Asylum from Somalia

We next address the Board's conclusion that Aden did not suffer persecution in Somalia. "[T]o establish eligibility for asylum on the basis of past persecution, an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir. 2000) (quoting *Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir. 2000)). "We will reverse the BIA's decision that an applicant is ineligible for asylum only if 'a reasonable fact-finder would have to conclude that the requisite fear of persecution existed.'" *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

---

[6] In light of the BIA's affirmance of the IJ's finding that Aden was persecuted in South Africa, however, it would seem illogical for the Board to conclude that Aden was firmly resettled.

## A.  Incidents Rising to Persecution

We define persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive."  *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995) (quoting *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995)).  Persecution is an "extreme concept that does not include every sort of treatment our society regards as offensive."  *Id.* (citation omitted).  "The key question is whether, looking at the cumulative effect of all the incidents a petitioner has suffered, the treatment she received rises to the level of persecution."  *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998).

We have consistently held that "[p]hysical harm has . . . been treated as persecution."  *Chand*, 222 F.3d at 1073; *accord Li v. Holder*, 559 F.3d 1096, 1107 (9th Cir. 2009) (recognizing it is well-established that physical violence constitutes persecution).  At the same time, we have recognized that a one-off physical beating did not compel a finding of persecution, even if, in our independent view, a reasonable factfinder could conclude such a beating rose to the level of persecution.  *See, e.g.*, *Prasad v. INS*, 47 F.3d 336, 339–40 (9th Cir. 1995); *Gu v. Gonzales*, 454 F.3d 1014, 1020 (9th Cir. 2006).  Nonetheless, when the incidents have involved physical harm *plus something more*, such as credible death threats, we have not hesitated to conclude that the petitioner suffered persecution.  *See Smolniakova v. Gonzales*, 422 F.3d 1037, 1049 (9th Cir. 2005) ("Repeated death threats, especially when those threats occurred in conjunction with other forms of abuse, require a finding of past persecution."); *Duarte de Guinac v. INS*, 179 F.3d 1156, 1162 (9th Cir. 1999) ("No case or statute provides that physical harm and death threats [do not rise to the level of]

persecution—quite the contrary."); *see also Borja v. INS*, 175 F.3d 732, 736–37 (9th Cir. 1999) (en banc) (concluding that record compelled finding of past persecution where petitioner suffered injury and death threat), *superseded by statute on other grounds as stated in Parussimova v. Mukasey*, 555 F.3d 734, 739–40 (9th Cir. 2009); *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997) (recognizing that death threats were sufficient to establish persecution). "What matters," in assessing the sufficiency of the threat to establish persecution, "is whether the group making the threat has the will or the ability to carry it out"—not whether it is, in fact, carried out. *Kaiser v. Ashcroft*, 390 F.3d 653, 658–59 (9th Cir. 2004) (quoting *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1984)). Another important consideration is whether the threat leaves the person with no realistic choice but to conform to the persecutor's way of life and forsake other political or religious beliefs, or flee. *See Kantoni v. Gonzales*, 461 F.3d 894, 898 (7th Cir. 2006) ("A credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution.").

Last, we have held that an asylum applicant's claim of persecution is further strengthened when evidence that the applicant was physically beaten and threatened with his life is presented in conjunction with evidence of the country's "political and social turmoil." *Korablina*, 158 F.3d at 1045; *see also Kaiser*, 390 F.3d at 658 ("Threats on one's life, within a context of political and social turmoil or violence, have long been held sufficient to satisfy a petitioner's burden of showing an objective basis for fear of persecution."). Importantly, "[e]ven if a single incident does not rise to the level of persecution, the cumulative effect of these several incidents constitutes persecution." *Smolniakova*, 422 F.3d at 1049.

Here, the IJ determined, and the Board agreed, that Aden had not suffered persecution in Somalia because he presented only evidence of a "one-time incident" involving a physical beating while working at his brother's theater. The Board further concluded—wrongly—that Aden's brother received threats after the raid on the theater, but Aden did not.

These determinations were not supported by substantial evidence, and Aden presented sufficient evidence to compel the conclusion that he suffered persecution at the hands of Al-Shabaab. Ten members of Al-Shabaab raided the theater that he and his brother operated, physically beat Aden, and cudgeled him on the head with the butt of a rifle, causing him to bleed profusely. Al-Shabaab also stole theater equipment, ensuring the theater would remain closed. To hide from Al-Shabaab, Aden and his brother moved to their uncle's home, where they made plans to flee the country. Two weeks after the raid, Aden's brother received a phone call threatening him that if they reopened the theater, *both* he and Aden would be killed—not just Aden's brother, as the Board found. Aden and his brother did not reopen the theater, remained in hiding, and fled Somalia two months later.

Although a one-off, minor physical assault followed by a life of unrestrained religious practice or political expression may not compel the conclusion that a person has suffered persecution, *see Prasad*, 47 F.3d at 339–40; *Gu*, 454 F.3d at 1020, Aden has presented a far more compelling case. In addition to physically beating Aden, members of Al-Shabaab kept tabs on him by contacting his brother and warned they would kill Aden and his brother if they continued to disobey Al-Shabaab's command. *See Kaiser*, 390 F.3d at 658; *Duarte de Guinac*, 179 F.3d at 1162; *Borja*,

175 F.3d at 736–37; *Sangha*, 103 F.3d at 1487.**[7]**   Unlike situations where the government evinced no lingering interest in the victim, the record evidence here shows that members of Al-Shabaab kept a close eye on Aden, his brother, and their political and religious activities.  The death threat further left Aden with the "bleak choice" of remaining steadfast in his way of life (and risking death) or succumbing to Al-Shabaab's demand for conformity.  *See Kantoni*, 461 F.3d at 897–98.  Such a chain of events reveals that Al-Shabaab intended to coerce Aden to submit to its new political and religious order, and used offensive strategies— beatings, destruction of property, and death threats—to achieve this goal.

Further, as the IJ recognized, Aden presented evidence that Somalia continued to experience political and social turmoil, given that Al-Shabaab "remains a major force in the country, and a danger to many, including in . . . [the region Aden is from]."**[8]**  *See Korablina*, 158 F.3d at 1045.  This

---

**[7]** The Board mistakenly relied on *Hoxha v. Ashcroft*, 319 F.3d 1179 (9th Cir. 2003), in affirming the IJ's denial of Aden's asylum claim. There, unlike here, the applicant was subjected to a lifetime of unfulfilled threats by various Serbs and then suffered a one-time beating that was "not connected with any particular threat."  *Id.* at 1182.

**[8]** *See, e.g.*, Human Rights Watch World Report (2016) ("Government forces failed to protect civilians, including journalists, clan elders, clerics and lawmakers and other officials from targeted killings by Al-Shabab as well as by unknown gunmen, primarily in Mogadishu, Baidoa, the capital of the Bay region, and Beletweyn, the capital of Hiraan."); Human Rights Watch, *UN Human Rights Council: Interactive Dialogue with the Independent Expert on the situation in Somalia* (Sept. 30, 2015), https://www.hrw.org/news/2015/09/30/un-human-rights-council-interactive-dialogue-independent-expert-situation -somalia ("This year has seen massive civilian displacement as well as

additional evidence provides the context for the harm and death threats that Aden experienced at the hands of Al-Shabaab.  Together, this evidence compels the conclusion that Aden suffered persecution while in Somalia.

## B.  Nexus

To prevail on an asylum claim, an applicant must also demonstrate that the persecution was "on account of" a statutorily protected ground.  *Parussimova*, 555 F.3d at 739.  To meet this "nexus" requirement, an applicant must show that the protected ground was "at least one central reason" the applicant was persecuted.  8 U.S.C. § 1158(b)(1)(B)(i).  "[A] motive is a 'central reason' if the persecutor would not have harmed the applicant if such motive did not exist." *Parussimova*, 555 F.3d at 741.  Motive can be established by a persecutor's statements to the victim.  *See Lopez v. Ashcroft*, 366 F.3d 799, 804 (9th Cir. 2004).  The motive may also be inferred if the factual circumstances alone demonstrate "no other logical reason for the persecution at issue." *Navas*, 217 F.3d at 657.  Further, "[i]f the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant's political opinion." *Xinbing Song v. Sessions*, 882 F.3d 837, 841 (9th Cir. 2017) (quoting *Sangha*, 103 F.3d at 1489).  In a similar vein, we have held that a person who is persecuted in response to the person's "resistance to discriminatory government action . . . is persecution on account of a protected ground." *Chand*, 222 F.3d at 1077; *see also Desir v. Ilchert*, 840 F.2d 723, 727–28 (9th Cir. 1988) (recognizing that, although a requirement to pay money to quasi-governmental forces may not on its own amount to

---

civilian casualties from targeted and indiscriminate attacks.  Al-Shabab militants continue to target civilians.").

persecution, punishment for *refusing* to pay amounts to persecution on account of a protected ground).

The IJ determined, and the Board agreed, that the attack on Aden was not "on account of" Aden's political opinion or religious beliefs because Al-Shabaab was motivated out of *its* political and religious beliefs, not Aden's. Substantial evidence does not support this determination. Members of Al-Shabaab twice contacted Aden's brother and ordered him to stop showing American and Hindi films because, in their view, such films were "Satanic" and forbidden in Islam. When Aden and his brother ignored that instruction, Al-Shabaab raided the theater, beat them, and later threatened to kill them if they reopened it. Al-Shabaab's accusation that the brothers were featuring Islamically forbidden, "Satanic" films provides direct evidence of their political and religious motives. *See Lopez*, 366 F.3d at 804 (finding that Guatemalan guerillas' statement to petitioner that he should not work for the wealthy provided direct proof of motive).

Further, even if the brothers did not feature the films out of their own political or religious convictions, Al-Shabaab at the very least imputed those beliefs to them. *See Xinbing Song*, 882 F.3d at 841–42 (explaining that government accusation that petitioner was "anti-government" was sufficient to show the officials imputed a political opinion to the applicant). Thus, the only logical explanation for Al-Shabaab's treatment of Aden and his brother was that their actions were subversive to Al-Shabaab's political and religious doctrine. *See id.*; *see also Chand*, 222 F.3d at 1077; *Desir*, 840 F.2d at 727–28.

In reaching the opposite conclusion, the Board cited the Supreme Court's decision in *Elias-Zacarias*. This reliance was misplaced. There, the Court considered only whether a guerrilla organization's forcible conscription policy

constituted per se persecution "on account of" political opinion. 502 U.S. at 479. The Court held it did not. *Id.* at 484. In doing so, the Court reasoned that a person might refuse to join a guerilla movement "for a variety of reasons"—even if they supported the movement—such as "fear of combat, a desire to remain with one's family and friends, [or] a desire to earn a better living in civilian life." *Id.* at 482. The Court further rejected the theory that the guerrillas' political motives could satisfy the nexus requirement because, the Court explained, the persecution must be "on account of the *victim's* political opinion, not the persecutor's." *Id.* at 482. Importantly—and unlike here— the asylum applicant was not punished for refusing to join or otherwise engaged in actions perceived as subversive. *Elias-Zacarias* thus does not apply.

Because the record evidence would compel any reasonable factfinder to conclude that Aden suffered persecution on account of a protected ground, we grant the petition on this basis.

## C. Well-founded Fear

Because Aden has shown that he suffered past persecution, he enjoys a presumption that if he returns to Somalia, he will be persecuted in the future. *See* 8 C.F.R. §§ 208.13(b)(1)(i), (ii); *Chand*, 222 F.3d at 1078. "[B]ecause neither the IJ nor the BIA found that the harm [Aden] suffered rose to the level of persecution, they did not accord [Aden] the presumption, and therefore did not consider whether changed conditions in [Somalia] were sufficient to rebut it." *See Chand*, 222 F.3d at 1078. We thus remand to allow the government an opportunity to rebut the presumption by showing changed country conditions. *See INS v. Orlando Ventura*, 537 U.S. 12, 16–18 (2002) (per curiam).

## V.  Withholding of Removal from Somalia

To be eligible for withholding of removal, an applicant must show that the evidence in the record demonstrates a "clear probability of persecution." *Korablina*, 158 F.3d at 1045.  A clear probability exists if it is "more likely than not" the person will be persecuted upon return. *Id.* at 1046 (citing *Cardoza-Fonseca v. INS*, 767 F.2d 1448, 1452 (9th Cir. 1985) and 8 C.F.R. § 208.16(b)(1)).  "A finding of past persecution triggers a regulatory presumption that the applicant's 'life or freedom would be threatened if deported.'" *Id.* (quoting *Vallecillo-Castillo v. INS*, 121 F.3d 1237, 1240 (9th Cir. 1996)).  To rebut this presumption, the government must show by a preponderance of the evidence that country conditions have so changed that it is no longer likely that the applicant would be persecuted there. *See Vallecillo-Castillo*, 121 F.3d at 1240.

Because Aden showed that he suffered past persecution, he was entitled to a presumption that his "life or freedom would be threatened if deported." *See id.* (citation and quotation marks omitted).  We thus remand to the Board to address this claim. *See Orlando Ventura*, 537 U.S. at 16–18.

### VI.  Conclusion

For the above reasons, we grant Aden's petition and remand for further proceedings consistent with this opinion.

**GRANTED and REMANDED.**

RAWLINSON, Circuit Judge, concurring:

I concur in the conclusion that this case should be remanded for reconsideration of the firm resettlement issue. I also agree that the Immigration Judge (IJ) failed to address in the context of firm resettlement the persecution experienced by Petitioner Abdi Asis Ali Aden (Aden) in South Africa.

The firm resettlement bar prevents the grant of asylum to an applicant who has firmly resettled in a different country before arriving in the United States. *See Nahrvani v. Gonzales*, 399 F.3d 1148, 1151 (9th Cir. 2005). The governing regulation at the relevant time period provided:

> An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:
>
> (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or
>
> (b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the

country of refuge that he or she was not in fact resettled. . . .

8 C.F.R. § 1208.15 (2019).

Although not addressed in the context of firm resettlement, the IJ made the following detailed findings regarding the persecution endured by Aden in South Africa:

> [Aden] testified that he worked as a shopkeeper in his cousin's store. . . . The first time [he] experienced problems in South Africa was in December 2012. On that day, . . . many people who were protesting immigrants in South Africa came to the store. . . . The protesters were angry at Somalis . . . and other immigrants that lived in South Africa. [Aden] tried to stop the protesters from taking things from the store and was injured in the process. He was beaten with wood sticks, but was able to flee. The protesters then lit the store on fire and the store had to be rebuilt. . . .
>
> [Aden] testified that in March 2013, late at night, [he] was asleep in the store and heard a noise. When [he] went to see what had caused the noise he saw 3–4 men inside the store. The men began to beat [Aden] and the other man there . . . with wooden sticks. . . . The men said to [Aden], "you guys are illegal aliens, you guys have no rights, and you have no rights to this business. . . ." [Aden] and his cousin reported the incident to the South African police. . . . But the South African

police did not do anything to investigate after the report was filed.

. . .

[Aden] testified that in December 2014, while [he] was working at the store, two men "who were thieves" came into the store with guns. They pushed the other worker on the ground and threatened to kill [Aden]. . . . The men said to [Aden], "you are the Somalis and you do not have rights in this country." [Aden] reported the incident to the South African police. . . . However, he never heard anything else from the police.

The IJ found Aden to be a credible witness. The IJ also acknowledged that Aden "submitted country conditions evidence corroborating . . . anti-immigration sentiment and violence in South Africa." Finally, the IJ noted that:

[w]hile the government states it is opposed to such anti-immigrant, anti-Somali violence, it is unable to stop it, and at times [has] gone so far as to deny that the attacks were anything other than general criminal behavior. . . . Members of the government, along with other South African leaders, have also made statements that appear to fuel the resentment and lead to more violence.

The Board of Immigration Appeals (BIA) adopted the IJ's finding that Aden was credible, and found no clear error in the IJ's other factual findings. Despite the fact that the IJ never addressed the issue of whether persecution by private actors may prevent application of the firm resettlement bar,

the BIA concluded that the firm resettlement bar applied to Aden because he "did not introduce any evidence that the South African government imposed any restrictions on his residency such that the exception in 8 C.F.R. § 1208.15(b) precluded him from being firmly resettled." However, this conclusion is not supported by substantial evidence in the record, as reflected in the IJ's factual findings. *See Maharaj v. Gonzales*, 450 F.3d 961, 967 (9th Cir. 2006) (en banc) (noting that we review a firm resettlement determination for substantial evidence). As discussed, the IJ found that not only did the South African police fail to investigate the xenophobic attacks against Somalis in South Africa, the South African government made statements that ostensibly "fuel[ed] the resentment," leading to additional violence. These facts were sufficient to support a claim that Aden's residence in South Africa was "substantially and consciously restricted by the authority of" South Africa such that Aden was never firmly resettled in South Africa. 8 C.F.R. § 1208.15 (2019). Therefore, I agree with the majority that this case should be remanded for the IJ to apply his findings to the provisions of the regulation governing the resettlement bar.

I also concur in the majority's conclusion rejecting the IJ's and BIA's determination that Aden failed to establish a nexus to a protected ground for the attacks in Somalia. The IJ described Aden's testimony that he and his brother began having problems with Al-Shabab, a terrorist organization that seeks to "enforce its interpretation of Islam." Aden shares the Muslim religion with Al-Shabab, but disagrees with its view of the proper interpretation of Islam. Aden's problems with Al-Shabab stemmed from his brother's operation of a movie theater showing "American and Hindi movies and sports." Al-Shabab objected to the showing of these movies, because they "promoted sinful ideas such as

showing women who were not fully covered." We have concluded that "[i]f an applicant can establish that others in his group persecuted him because they found him insufficiently loyal or authentic to the religious . . . ideal they espouse, he has shown persecution on account of a protected ground." *Maini v. I.N.S.*, 212 F.3d 1167, 1175 (9th Cir. 2000). Because of this binding precedent, I agree with the majority that the opposite conclusion reached by the IJ and BIA is not supported by substantial evidence.