**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SHAMSHER SINGH, | No. 20-72806 |
| *Petitioner,* | Agency No. A215-906-373 |
| v. | |
| MERRICK B. GARLAND, Attorney General, | ORDER AND AMENDED OPINION |
| *Respondent.* | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted June 7, 2022
Seattle, Washington

Filed September 14, 2022
Amended January 12, 2023

Before: Ronald Lee Gilman,[*] Sandra S. Ikuta, and Eric D. Miller, Circuit Judges.

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

Order;
Opinion by Judge Gilman;
Concurrence by Judge Miller;
Dissent by Judge Ikuta

## SUMMARY[**]

### Immigration

The panel filed an order (1) amending the opinion filed on September 14, 2022; (2) denying the Respondent's petition for panel rehearing, noting that the majority voted to deny, and Judge Ikuta voted to grant, the petition for panel rehearing; and (3) indicating that no further petitions for rehearing or for rehearing en banc would be entertained. In the amended opinion, the panel granted in part and denied in part Shamsher Singh's petition for review of a decision of the Board of Immigration Appeals, and remanded, holding that substantial evidence did not support the BIA's determination that the harm Singh suffered did not rise to the level of past persecution, but substantial evidence did support the BIA's determination that the harm did not amount to past torture and that Singh failed to show that he would more likely than not face a clear probability of future torture.

As an initial matter, the panel noted that the immigration judge found Singh to be a credible witness. There were only

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

two concerns the IJ expressed regarding Singh's credibility: (1) a minor omission in his declaration; and (2) his testimony contained speculation. The panel wrote that neither concern was sufficient for an adverse credibility determination. The panel noted that the IJ concluded that Singh's testimony was "otherwise consistent with his written statement and plausible in light of evidence of country conditions." The panel further noted that the BIA did not question this credibility determination, and there was no indication that the BIA implicitly found the presumption of credibility rebutted. The panel wrote that the only question for judges reviewing the BIA's factual determinations is whether any reasonable adjudicator could have found as the agency did. Here, the panel deferred to the agency's credibility determination, which was supported by substantial evidence.

Observing that this court has applied both de novo and substantial evidence review to the question of whether a petitioner's past harm rose to the level of persecution, the panel wrote that it need not address which standard applied because the harm Singh suffered rose to the level of persecution under the more deferential substantial evidence standard. The panel concluded that five factors compelled the conclusion that Singh experienced serious harm amounting to persecution: (1) he was forced to flee his home after being repeatedly assaulted; (2) one of those incidents involved a death threat; (3) he was between the ages of 16 and 18 when the attacks occurred; (4) his brother also experienced this violence; and (5) this court has already recognized that Mann Party members have faced persistent threats in the region of India where Singh was twice attacked. The panel noted that the IJ and the BIA found no reason to doubt the truth, or persuasiveness, of these five core factors. Explaining that the past-persecution analysis is

informed by comparing the facts of a petitioner's case with those of similar cases, the panel considered the cases the BIA cited in its decision and concluded that they were distinguishable. The panel wrote that the combination of death threats and physical violence that Singh experienced was squarely in line with what this court has held is sufficient to compel a finding of past persecution.

The panel clarified that the BIA had not resolved other issues relevant to past persecution, including whether the Indian government was unwilling or unable to control Singh's attackers, and whether the persecution was on account of a statutorily protected ground. And because the BIA concluded that Singh had not demonstrated past persecution, the BIA had improperly placed the burden on Singh to show that he could not reasonably relocate within India to avoid future persecution. The panel explained that if Singh is able, on remand, to demonstrate that the serious harm he suffered was on account of a statutorily protected ground at the hands of individuals whom the government was unable or unwilling to control, then that showing would give rise to a presumption of a well-founded fear of future persecution and shift the evidentiary burden to the government to rebut that presumption by showing that there has been a fundamental change in circumstances concerning Singh's well-founded fear of future persecution or that Singh could avoid future persecution by reasonably relocating to another part of India. The panel cautioned that an applicant cannot be said to have the ability to relocate within his home country if he would have to remain in hiding there.

The panel held that substantial evidence supported the BIA's determinations that Singh did not suffer past treatment amounting to torture, and that he failed to establish that it is more likely than not that he will be tortured in India by or at

the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Concurring, Judge Miller wrote to express his view that the en banc court should take up the issue, if the Supreme Court does not do so sooner, of what standard of review applies to the BIA's determination that the harm an alien suffered was not sufficiently severe to constitute persecution. Judge Miller wrote that whatever the standard of review, this court's cases in this area permit no conclusion other than that the harm that Singh suffered constituted persecution.

Dissenting, Judge Ikuta wrote that a determination by the BIA that an alien is not entitled to asylum must be upheld unless a reasonable factfinder would be *compelled* to conclude to the contrary. Judge Ikuta wrote that the majority flipped this standard on its head. Instead of deferring to the BIA's determination as one of potentially many reasonable possibilities, the majority claimed that the BIA's decision was contrary to court precedent. Judge Ikuta explained that this court's precedent encompasses wide-ranging views of what constitutes persecution, and that a fair review of its cases shows that the majority reached its conclusion only by cherry-picking similar facts in cases where the court has reversed the BIA, and distinguishing similar facts in cases where it has upheld the BIA.

## COUNSEL

Maleha N. Khan-Avila (argued), Riverside, California;
Erika Roman, Law Office of Erika Roman, Woodland Hills,
California; for Petitioner.

Sarah L. Martin (argued), Jaclyn G. Hagner, and Aaron D.
Nelson, Trial Attorneys; Walter M. Evans, Senior Litigation
Counsel; Sabatino F. Leo, Assistant Director; Brian
Boynton, Acting Assistant Attorney General; Office of
Immigration Litigation, Civil Division, United States
Department of Justice, Washington, D.C.; for Respondent.

## ORDER

The opinion, filed on September 14, 2022, and reported
at 48 F.4th 1059 (9th Cir. 2022), is amended as follows:

At 48 F.4th at 1067, the last sentence and its citation in
the first paragraph of Part II.B.1. are deleted and replaced
with the following paragraph:

> The IJ found Singh to be a credible
> witness. There were only two concerns that
> the IJ expressed regarding Singh's
> credibility: (1) a minor omission in his
> declaration, and (2) his testimony contained
> speculation. Neither concern was sufficient
> for an adverse credibility determination, and
> the IJ concluded that Singh's testimony was
> "otherwise consistent with his written
> statement and plausible in light of evidence
> of country conditions." The BIA did not

question this credibility determination, and there is no indication that "the BIA implicitly found the presumption of credibility rebutted." *Garland v. Dai*, 141 S. Ct. 1669, 1679 (2021). "The only question for judges reviewing the BIA's factual determinations is whether *any* reasonable adjudicator could have found as the agency did." *Id.* at 1678. Here, we defer to the agency's credibility determination, which was supported by substantial evidence.

At 48 F.4th at 1068, at the end of the first paragraph of Part II.B.1.i., the following sentence is added:

The IJ and the BIA found "no reason to doubt the truth, or 'persuasiveness,'" of these five core factors. *See Plancarte Sauceda v. Garland*, 23 F.4th 824, 827 (9th Cir. 2022) (citing *Dai*, 141 S. Ct. at 1680-81).

At 48 F.4th at 1072, at the end of the last paragraph of Part II.B.2., the following sentence is added:

We caution that "an applicant cannot be said to have the ability to 'relocate' within [his] home country if [he] would have to remain in hiding there." *Akosung v. Barr*, 970 F.3d 1095, 1102 (9th Cir. 2020).

An Amended Opinion is being filed concurrently with this Order. With the Opinion as amended, the panel majority has voted to DENY Respondent's petition for panel rehearing, filed November 14, 2022. Judge Ikuta has voted to grant the petition for rehearing. No subsequent petitions for panel or en banc rehearing will be entertained.

## OPINION

GILMAN, Circuit Judge:

Shamsher Singh, a native and citizen of India, petitions for review of an order of the Board of Immigration Appeals (BIA) dismissing his applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Singh asserts that he suffered past persecution and has a well-founded fear of future persecution due to his familial association with his brother, who is a member of the Shiromani Akali Dal Party (Mann Party), and his own affiliation with that Party. The Mann Party advocates for the creation of a sovereign state for Sikh people and is opposed by the Congress Party, one of India's major political parties.

The immigration judge (IJ) and the BIA concluded that Singh did not qualify for asylum or withholding of removal because the injuries and threats that Singh had suffered at the hands of Congress Party members were not sufficiently serious. After reaching this conclusion, neither the IJ nor the BIA proceeded to analyze whether Singh had established the other elements of an asylum claim based on past persecution.

Because the IJ and the BIA determined that Singh did not establish past persecution, Singh bore the burden of proving that he had a well-founded fear of future persecution. The IJ and the BIA concluded that Singh had not borne his burden of proof. They also concluded that Singh did not qualify for CAT protection because he had not established that it is more likely than not that he would be tortured by or at the acquiescence of public officials if he returned to India.

For the reasons set forth below, we GRANT Singh's petition in part, DENY Singh's petition in part, and REMAND to the BIA for further proceedings consistent with this opinion.

## I. BACKGROUND

Singh entered the United States without documentation in October 2018. He applied for admission to the United States later that same month, just a few days before he turned 18. The Department of Homeland Security commenced removal proceedings against him, charging Singh with inadmissibility because he lacked a valid visa or other entry document when he applied for admission.

Singh attended removal proceedings before an IJ in December 2018. Through counsel, Singh conceded the charges against him, and the court found removability established. Singh then filed the relevant application for asylum, withholding of removal, and protection under CAT.

### A. Singh's testimony

In January 2019, Singh testified before the IJ about the circumstances that he faced prior to coming to the United States. Singh stated that members of the Congress Party had verbally and physically attacked him on multiple occasions

in 2017 and 2018 because of his affiliation with the Mann Party.

Singh's brother, Harpreet, joined the Mann Party in December 2016.  Soon thereafter, Singh started assisting his brother in providing services to the Mann Party.  Harpreet was attacked by members of the Congress Party in April and August 2017, suffering serious internal injuries.  He subsequently fled to the United States in November 2017.

That same month, Singh was verbally confronted by four members of the Congress Party.  They demanded to know where his older brother was.  And they threatened the brothers, warning them to stop providing services to the Mann Party and join the Congress Party.  These individuals also told Singh to sell drugs on their behalf.

The threats soon escalated. The first physical attack occurred in February 2018 when Singh was returning from offering his prayers at a Sikh temple.  Four men approached Singh and told him, again, that he needed to quit the Mann Party and join the Congress Party.  The men then slapped Singh on his face, hit his stomach, threw him to the ground, and started kicking his stomach.  Singh knew that they were from the Congress Party because they said that Singh needed to join "our party, the Congress Party" and because there was a symbol of a palm on their motorcycles, which symbolizes the Congress Party.

After the February 2018 attack, Singh's grandmother gave him herbal remedies at home.  He then reported the incident to the police near his hometown of Maqsudpur. Singh's father accompanied him to make the report.  The police told Singh and his father that something was wrong with Singh for trying to file a false report against the

government that was currently in power and that Singh had better leave the police station immediately.

A second physical attack occurred in July 2018 when Singh was returning home from the family's farm. Singh was on his bicycle alone when a vehicle approached him and stopped in front of his bicycle. Five men emerged from the vehicle and told Singh that he would suffer the consequences of failing to join their party and of attempting to file a report with the police. The men beat Singh with hockey sticks all over his back and arms. They told Singh that they were going to kill him.

Some nearby farmers heard Singh's screams and ran toward the group. This caused the men to run back to their vehicle and leave. The farmers took Singh to the village doctor, who provided him with bandages and medication. Singh did not report this second attack to the police because they had told him after the first attempted report "that if you ever show up over here again we will frame you in a false case and lock you up."

During the hearing before the IJ, Singh testified that he could not safely relocate within India because the Congress Party would find him wherever he moved. He explained that, even in a city as large as New Delhi, he could be found because his identification and information would be processed if he sought housing or an education.

Singh explained that, after staying in Maqsudpur "in a hiding manner" for a few weeks, he lived with his uncle in Plath until September 2018. At that point Singh left India.

## B. The IJ's decision

The IJ issued a decision finding Singh removable as charged and denying his applications for asylum,

withholding of removal, and CAT relief. From the outset, however, the IJ found Singh credible.

Despite that finding, the IJ declined to "find the totality of the record here support[ed] a finding of past persecution" because the IJ found no evidence in the record to show that Singh suffered "any serious injuries" or any that "required serious medical attention" from his attacks. In addition, the IJ found that Singh's continued presence in Maqsudpur for nearly a year after the initial verbal confrontation "significant." The IJ also found that "[t]he fact that the police declined to investigate [Singh's] vague accusations does not amount to persecution. Nor does the officer's order to [Singh] to depart the station or face possible arrest amount to persecution."

In evaluating Singh's future-persecution claim, the IJ found that Singh had not established an individualized risk of persecution if he returned to India, nor had he established a practice or pattern of persecution against similarly situated individuals. The IJ found, in his analysis of individualized risk, that Singh had failed to demonstrate that the attackers had "any interest in persecuting him if he were to return" to India.

The IJ also determined that Singh could internally relocate within India to avoid persecution. According to the IJ, Singh did not establish that his persecutors were members of the Indian government or a government-sponsored entity, and that Singh's time with his uncle showed that he could safely move to a different place in India. Based on this analysis, the IJ denied Singh's application for asylum and for withholding of removal.

The IJ also denied Singh's application for CAT protection. He found "no credible evidence in this record to

demonstrate that [Singh] suffered mistreatment amounting to torture while in India by public officials or by individuals acting at the instigation of or with the consent or acquiescence of public officials." The IJ noted that "Indian law prohibits the use of torture and other forms of cruel, inhuman, or degrading treatment or punishment." He also found that Singh "only present[ed] a speculative fear of being harmed in [India], as opposed to a particularized fear of torture," and that "[a]ny fear of future harm in India possessed by [Singh] would be at the hands of private individuals."

## C. The BIA's decision

Singh appealed the IJ's decision to the BIA. In dismissing the appeal, the BIA reviewed Singh's past-persecution claim, concluding that "the cumulative effect of [Singh's] alleged harm does not rise to the level of persecution." Although the BIA found that Singh had been verbally accosted once and physically beaten twice (once with hockey sticks) and that one of these physical beatings was accompanied with a death threat, the BIA concluded that Singh failed to establish past persecution because "the record lacks evidence to show that [Singh] suffered any serious injuries." It based this conclusion on the evaluation from the doctor who treated Singh after his second physical assault by members of the Congress Party that had "indicated that the extent of his injuries were 'small bruises, scratches, blue marks and some part of swollen body.'"

The BIA next rejected Singh's future-persecution claim. Because the BIA had determined that Singh had not suffered any past persecution, it held that Singh bore the burden of demonstrating that he had a well-founded fear of future persecution as well. The BIA agreed with the IJ that Singh

did not establish "an objectively reasonable fear that he would be singled out for persecution if he returns to India" because "he 'has not shown that the unnamed individuals he claims were members of the Congress Party, who allegedly offered him the opportunity to sell drugs, have any interest in persecuting him if he were to return to his home country.'"

Like the IJ, the BIA found significant the fact that Singh's father continues to live in India without any interactions with the unknown assailants, and that Singh was able to freely depart the country using his passport. The BIA also rejected Singh's reliance on country reports that mention mass corruption and bribes in India with regard to police officers. It determined that these reports were indicative only of a generalized fear rather than an individual fear of persecution.

In relation to the persecution claims, the BIA affirmed the IJ's determination that Singh had failed to demonstrate that he is unable to relocate within India or that relocation is unreasonable. The BIA relied on the IJ's finding that Singh "did not provide evidence that the source of [the] alleged persecution is the Indian government or a government-sponsored entity," and that "the record lacks evidence to show that the 'unknown, masked individuals' who confronted [Singh] were public officials or were doing so on behalf of the Indian government." In addition, the BIA noted that the IJ "determined that record evidence establishes [Singh's] ability to safely relocate within India."

The BIA finally reached Singh's CAT claim. It determined that "there is no clear error in the Immigration Judge's determination that [Singh] has not established that it is more likely than not that he will be tortured in India by or at the instigation of or with the consent or acquiescence of a

public official or other person acting in an official capacity." The BIA offered no additional reasoning for this finding.

## II.    ANALYSIS

### A.  Standards of review

"Our review is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Khudaverdyan v. Holder*, 778 F.3d 1101, 1105 (9th Cir. 2015) (citation and internal quotation marks omitted). Questions of law are reviewed de novo. *Rodriguez v. Holder*, 683 F.3d 1164, 1169 (9th Cir. 2012). Factual findings are reviewed under the substantial-evidence standard. *Navas v. INS*, 217 F.3d 646, 657 (9th Cir. 2000) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). Under this standard, "[a] factual finding is 'not supported by substantial evidence when any reasonable adjudicator would be compelled to conclude to the contrary based on the evidence in the record.'" *Aden v. Wilkinson*, 989 F.3d 1073, 1079 (9th Cir. 2021) (quoting *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059 (9th Cir. 2017) (en banc)).

The following analysis focuses primarily on whether Singh's experiences in India constituted past persecution. We have held that "[w]hether particular acts constitute persecution for asylum purposes is a legal question reviewed de novo." *Kaur v. Wilkinson*, 986 F.3d 1216, 1221 (9th Cir. 2021) (alterations omitted) (quoting *Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1088 (9th Cir. 2005)); *see also Flores Molina v. Garland*, 37 F.4th 626, 640 (9th Cir. 2022) (Korman, J., concurring) (identifying cases in which we have used the substantial-evidence standard to review the past-persecution question and explaining why "the substantial evidence standard is not a good fit for questions,

like the one presented in this case, regarding the application of a legal standard to settled facts").

But we have also held that we "review for substantial evidence the BIA's particular determination that a petitioner's past harm 'does not amount to past persecution.'" *Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2021) (alteration omitted) (quoting *Villegas Sanchez v. Garland*, 990 F.3d 1173, 1179 (9th Cir. 2021)). Like this court in *Flores Molina*, "[w]e need not address whether de novo review should apply, or discuss the nuances of the two standards, because the harm [Singh] suffered rose to the level of persecution under the more deferential 'substantial evidence' standard of review" as we have applied that standard in evaluating claims of past persecution. *Flores Molina*, 37 F. 4th at 633 n.2 (citing *Fon v. Garland*, 34 F.4th 810, 813 n.1 (9th Cir. 2022)).

## B. Asylum

Asylum is available at the discretion of the Attorney General to an applicant who demonstrates that he is a "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" is defined as someone "who is unable or unwilling to return to the country of origin 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Melkonian v. Ashcroft*, 320 F.3d 1061, 1064 (9th Cir. 2003) (quoting 8 U.S.C. § 1101(a)(42)(A)). "The source of the persecution must be the government or forces that the government is unwilling or unable to control." *Canales-Vargas v. Gonzales*, 441 F.3d 739, 743 (9th Cir. 2006).

### 1.  Singh's past persecution

Singh may demonstrate past persecution with evidence that (1) he has endured serious harm such that his "treatment rises to the level of persecution"; (2) "the persecution was committed by the government, or by forces that the government was unable or unwilling to control"; and (3) "'the persecution was on account of one or more protected grounds,' such as a political opinion." *See Kaur*, 986 F.3d at 1221–22 (quoting *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062 (9th Cir. 2017) (en banc)).  If Singh makes such a showing, then the government bears the burden of demonstrating that Singh can safely relocate within India and that doing so is not unreasonable. *See id.* at 1230–31.

The IJ found Singh to be a credible witness.  There were only two concerns that the IJ expressed regarding Singh's credibility: (1) a minor omission in his declaration, and (2) his testimony contained speculation.  Neither concern was sufficient for an adverse credibility determination, and the IJ concluded that Singh's testimony was "otherwise consistent with his written statement and plausible in light of evidence of country conditions."  The BIA did not question this credibility determination, and there is no indication that "the BIA implicitly found the presumption of credibility rebutted." *Garland v. Dai*, 141 S. Ct. 1669, 1679 (2021).  "The only question for judges reviewing the BIA's factual determinations is whether *any* reasonable adjudicator could have found as the agency did." *Id.* at 1678.  Here, we defer to the agency's credibility determination, which was supported by substantial evidence.

The BIA "affirm[ed] the Immigration Judge's determination that the lack of serious harm does not support a finding of persecution."  Its analysis of Singh's past-

persecution claim stopped at the serious-harm prong based on this conclusion.  As the analysis below explains, we conclude that the BIA's determination that Singh did not suffer serious harm is not supported by substantial evidence. The BIA's analysis therefore should have proceeded to the remaining components of the past-persecution analysis.  For this reason, we remand Singh's petition to the BIA so that it can complete the past-persecution analysis.

### i.    *Serious harm*

We begin with an analysis of whether the record demonstrates that Singh was a victim of serious harm while in India.  Five factors compel the conclusion that Singh indeed experienced serious harm:  (1) he was forced to flee his home after being repeatedly assaulted; (2) one of those incidents involved a death threat; (3) he was between the ages of 16 and 18 when the attacks occurred; (4) his brother also experienced this violence; and (5) we have already recognized that Mann Party members have faced persistent threats in the region of India where Singh was twice attacked.  The IJ and the BIA found "no reason to doubt the truth, or 'persuasiveness,'" of these five core factors.  *See Plancarte Sauceda v. Garland*, 23 F.4th 824, 827 (9th Cir. 2022) (citing *Dai*, 141 S. Ct. at 1680-81).

Our recent decision in *Flores Molina* makes clear that, where "repeated incidents in which [the petitioner] fled were each 'in the face of an immediate threat of severe physical violence or death,'" those incidents "rise to the level of persecution."  *Flores Molina v. Garland*, 37 F.4th 626, 634 (9th Cir. 2022) (quoting *Mendoza-Pablo v. Holder*, 667 F.3d 1308, 1314 9th Cir. 2012)); *id.* at 636 ("Any reasonable adjudicator would be compelled to hold that the repeated and specific death threats that Flores Molina experienced, amid

the violence and menacing confrontations to which he was subjected, amount to persecution.").

We have held that "being forced to flee from one's home in the face of an immediate threat of severe physical violence or death is squarely encompassed within the rubric of persecution." *Id.* at 633–34 (quoting *Mendoza-Pablo*, 667 F.3d at 1314); *see also Kaur*, 986 F.3d at 1222 (holding that "[t]he hallmarks of persecutory conduct include, but are not limited to, the violation of bodily integrity and bodily autonomy" (citing *Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998))); *Lopez v. Ashcroft*, 366 F.3d 799, 803 (9th Cir. 2004) ("[P]hysical harm constitutes persecution." (citing *Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir. 2000))).

We have also held that "[w]here an applicant suffers such harm on more than one occasion, and as in this case is victimized at different times over a period of years, the harm is severe enough that no reasonable fact-finder could conclude that it did not rise to the level of persecution" necessary to sustain an asylum claim. *Chand*, 222 F.3d at 1073–74 (citing *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998)). Even if an applicant does not suffer physical violence, we have "consistently held that death threats alone can constitute persecution." *Canales-Vargas*, 441 F.3d at 743–44 (quoting *Navas*, 217 F.3d at 658); *see also Flores Molina*, 37 F.4th at 634 ("And we have 'consistently held that *death* threats *alone* can constitute persecution.'" (emphasis in original) (quoting *Navas*, 217 F.3d at 658).

Singh had to flee his home after he was the victim of a verbal confrontation and two physical attacks, one of which involved a death threat. Based on our precedents, he suffered serious harm. The BIA disagreed, noting that Singh suffered from only bruises, scratches, and swollen body parts

after these altercations.  But we do not require severe injuries to meet the serious-harm prong of the past-persecution analysis.  *See Flores Molina*, 37 F.4th at 636 ("'[I]t is the conduct of the persecutor' that is relevant to evaluating whether past treatment rises to the level of persecution—not 'the level of harm' or 'subjective suffering' the petitioner experienced." (quoting *Kaur*, 986 F.3d at 1226)).  As we have previously noted, "it would be a strange rule if the absence or presence of a broken arm were the dispositive fact" in an asylum claim. *Mihalev v. Ashcroft*, 388 F.3d 722, 730 (9th Cir. 2004).

The conclusion that Singh experienced serious harm is strengthened by the fact that these attacks occurred when he was between the ages of 16 and 18.  "Age can be a critical factor in the adjudication of asylum claims and may bear heavily on the question of whether an applicant was persecuted or whether she holds a well-founded fear of future persecution." *Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042, 1045 (9th Cir. 2007) (citation and alteration omitted).

The determination that Singh's experiences constitute serious harm is further compelled by the fact that Singh's brother, Harpreet, also experienced physical violence and was forced to flee India because "harms that have befallen a petitioner's family members or close friends" strengthen an applicant's past-persecution claim. *Sharma v. Garland*, 9 F.4th 1052, 1062 (9th Cir. 2021).  Harpreet was attacked in April and August 2017 and suffered internal injuries at the hands of Congress Party members.  A local Mann Party representative wrote that "[s]hould Harpreet Singh return[] to India to adopt normal life, it is more than likely that he would be prosecuted by the government authorities and can be eliminated like many other activists."  That conclusion

was based, in part, on the persecution faced by many of those affiliated with the Mann Party in the "recent past."

Finally, we have recognized in multiple cases that "Mann Party members have faced persistent harassment, intimidation, threats, and violence in Punjab," the Indian state in which Singh was twice attacked. *Kaur*, 986 F.3d at 1219–20 (first citing *Singh v. Whitaker*, 914 F.3d 654, 657 (9th Cir. 2019); and then citing *Singh v. Ashcroft*, 362 F.3d 1164, 1167–68 (9th Cir. 2004)). We have "held that an asylum applicant's claim of persecution is further strengthened when evidence that the applicant was physically beaten and threatened with his life is presented in conjunction with evidence of the country's 'political and social turmoil.'" *Aden*, 989 F.3d at 1083 (quoting *Korablina*, 158 F.3d at 1045).

Despite this compelling evidence, the BIA affirmed the IJ's determination that Singh did not suffer from past persecution because he did not suffer serious physical injury. But that "strange rule" is not, in fact, the rule. In the subsequent analysis, we delve into the cases cited by the BIA to support its conclusion. We do this because past-persecution analysis is "best answered by comparing the facts of Petitioner's case with those of similar cases." *Singh*, 134 F.3d at 967–68 (citation omitted).

### a. Cases cited by the BIA

The BIA cited three cases in support of its decision: *Duran-Rodriguez v. Barr*, 918 F.3d 1025 (9th Cir. 2019); *Hoxha v. Ashcroft*, 319 F.3d 1179 (9th Cir. 2003); and *Gu v. Gonzales*, 454 F.3d 1014 (9th Cir. 2006). None of these cases involve multiple instances of physical violence coupled with a death threat.

In *Duran-Rodriguez*, we determined that a death threat from men believed to be hitmen delivered once over the phone and once in person over the course of two days was insufficient to compel the conclusion that the petitioner suffered past persecution. 918 F.3d at 1028. *Duran-Rodriguez* is dissimilar from the instant case because Singh experienced physical violence in conjunction with a death threat—Duran-Rodriguez did not—and because Singh was subject to the constant threat of violence over the course of two years, not two days.

The BIA also cited *Hoxha* for its conclusion that Singh did not suffer past persecution. This reliance is misplaced. In *Hoxha*, an ethnic Albanian from the former Kosovo region of Serbia testified to suffering from harassment, threats, and mistreatment at the hands of Serbs. Hoxha and a friend were beaten by an anonymous group of Serbs on one occasion when they were overheard speaking Albanian. In concluding that Hoxha had introduced insufficient evidence to compel a finding of past persecution, we focused on the fact that the single incident of physical violence "was not connected with any particular threat and there [was] no evidence that the attackers knew who Hoxha was or that they showed any continuing interest in him." 319 F.3d at 1182.

In contrast, the attacks against Singh were connected with particular threats. The 2018 attacks took place after Congress Party members confronted Singh verbally in 2017 and attacked Singh's brother, Harpreet, earlier that year. Evidence within the record also indicates that Singh's attackers knew his identity and demonstrated a continuing interest in him. During the third incident, Singh's attackers sought him out on the route between his family's farm and his home and threatened him with death. Sufficient evidence demonstrates that Singh's attackers knew his identity and

displayed a continuing interest in him, unlike the attackers in *Hoxha*.

*Gu* is somewhat more applicable to the instant case than *Duran-Rodriguez* or *Hoxha*, but is still distinguishable. In *Gu*, the applicant experienced one brief detention, beating, and interrogation by the Chinese police because he distributed Christian religious materials and participated in an unsanctioned religious practice. We concluded that the one incident did not compel a finding of past persecution, distinguishing cases in which the persecutor had some "continued interest" in the petitioner from those of "a single, isolated encounter." 454 F.3d at 1020–21. Unlike the petitioner in *Gu*, Singh was repeatedly targeted over a period of two years, with members of the Congress Party tracking his actions and taking a "continued interest" in his political activity and efforts to get police help.

### b.   Two similar cases

Because the past-persecution analysis is informed "by comparing the facts of Petitioner's case with those of similar cases," *Singh*, 134 F.3d at 967–68, we now turn to two cases that are quite similar to Singh's: *Aden*, 989 F.3d 1073, and *Flores Molina*, 37 F.4th 626.

In relevant part, Aden and his family experienced one physical attack and a death threat while living in Somalia. Aden worked in a theater that his brother owned. His brother was told twice to shut down the theater, but he refused to do so. One month later, ten men raided the theater while Aden and his brother were working there. They struck Aden in the head with the butt of a gun and confiscated the movie-screening equipment.

The *Aden* court determined that "Aden presented sufficient evidence to compel the conclusion that he suffered persecution" because when the incidents at issue in an applicant's case "have involved physical harm *plus something more*, such as credible death threats, we have not hesitated to conclude that the petitioner suffered persecution." *Id.* at 1082–83 (collecting cases). It characterized *Gu* as an instance of "one-off, minor physical assault followed by a life of unrestrained religious practice or political expression" that did not "compel the conclusion that a person has suffered persecution" within the meaning of the statute. *Id.* at 1083.

We found that Aden's case was distinct from *Gu* because "Aden [] presented a far more compelling case" by showing that his attackers physically beat him and "kept tabs on him by contacting his brother and warn[ing] they would kill Aden and his brother if they continued to disobey" the attackers' commands. *Id.* Moreover, "Aden presented evidence that Somalia continued to experience political and social turmoil." *Id.* at 1084 & n.8 (citing Human Rights Watch World Report (2016); Human Rights Watch, *UN Human Rights Council: Interactive Dialogue with the Independent Expert on the Situation in Somalia* (Sept. 30, 2015), https://www.hrw.org/news/2015/09/30/unhuman-rights-council-interactive-dialogue-independent-expert-situation-somalia).

As explained above, Singh's attackers (like Aden's) beat him and targeted him and his brother specifically. They also kept tabs on him, noting that he had reported their behavior to the police and following him when he was traveling from his family's farm. Singh's case is even more extreme than Aden's in some ways because Singh was physically attacked

twice in India, whereas Aden was physically attacked only once while he was in Somalia.

*Flores Molina* is also similar to Singh's case. In *Flores Molina*, the petitioner alleged past persecution in Nicaragua based on death threats that he received after protesting the Ortega government. Government operatives circulated social media posts stating that Flores Molina was an instigator and that he should be sent to prison. Ortega supporters subsequently drove to Flores Molina's home and verbally threatened him. Masked individuals then spray painted Flores Molina's home with the words "Bullets to Strikers."

After these verbal threats, Flores Molina fled his home. Paramilitary members arrived at his hideaway wearing ski masks and demanded that he come outside. He evaded detection in the backyard. Once the paramilitary members left, Flores Molina fled for a second time. Six masked individuals found his second hideaway. These individuals hit Flores Molina in the face, causing him to lose a tooth and ultimately develop a scar on his lip. "As they beat him, the attackers warned Flores Molina, 'This is what happens to the ones that want to be part of the coup. And at the next encounter, we're going to kill you.'" 37 F.4th at 631. Flores Molina did not go to the doctor to treat his injuries for fear of seeing police officers and paramilitary members at the hospital. *Id.*

The BIA held that Flores Molina had failed to show past persecution. In rendering its decision, the BIA relied on *Lim v. INS*, 224 F.3d 929 (9th Cir. 2000), for the conclusion that threats must be very extreme to constitute persecution and on *Gu* for the proposition that physical harm must rise to a particular level to constitute persecution.

But we held that the record compelled the conclusion that Flores Molina's experiences constituted persecution because "being forced to flee from one's home in the face of an immediate threat of severe physical violence or death is squarely encompassed within the rubric of persecution," and "death threats alone can constitute persecution." *Id.* at 633–35 (citations and emphases omitted). The court distinguished *Lim* because Lim and his family had never been assaulted or closely confronted, whereas Flores Molina had been physically beaten by political opponents. *Id.* at 635. Additionally, the court distinguished *Gu* because Flores Molina, unlike Gu, experienced past persecution based on multiple threats, an instance of physical assault, and the broader context of violence targeted at him and others who expressed dissatisfaction with the Ortega government. *Id.* at 635–36.

The combination of death threats and physical violence that Singh experienced is squarely in line with what we held in *Aden* and *Flores Molina* was sufficient to compel a finding of past persecution. Like Singh, neither Aden nor Flores Molina suffered any life-threatening physical injuries. At bottom, Aden, Flores Molina, and Singh were involved in fundamentally the same scenario: a petitioner targeted for his political views, threatened (including a death threat), assaulted (leaving physical wounds), and compelled to flee his home.

### ii.       *Government involvement*

We now turn to whether "the persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Kaur*, 986 F.3d at 1221. In a different portion of the order, the BIA noted that Singh "did not provide evidence that the source of [the] alleged

persecution is the Indian government or a government-sponsored entity." But the BIA did not address the question of whether the government was either "unable or unwilling to control" the attackers, and we clarify for the parties and the agency that this prong of the past-persecution analysis has not yet been resolved.

### iii.    Protected grounds

To prevail on an asylum claim, a petitioner must also demonstrate that the persecution was "on account of" a statutorily protected ground. *Parussimova v. Mukasey*, 555 F.3d 734, 739 (9th Cir. 2009). Singh argues that he was attacked for his own attributed political opinion and his association with his brother, a member of the Mann Party. As above, we clarify that this question still needs to be addressed on remand.

### 2.  Singh's fear of future persecution

If Singh is able, on remand, to demonstrate that he suffered past persecution on account of a statutorily protected ground at the hands of individuals whom the government was unable or unwilling to control, then the showing would "give[] rise to a presumption of a well-founded fear of future persecution and shift[] the evidentiary burden to the government to rebut that presumption." *See Canales-Vargas*, 441 F.3d at 743 (citation omitted). The government would be required to show that there has been a "fundamental change in circumstances" concerning Singh's well-founded fear of future persecution or that Singh could "avoid future persecution by relocating to another part of [India], and under all the circumstances, it would be reasonable to expect [him] to do so." *See Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1089 (9th Cir. 2005) (alteration omitted) (quoting 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B)).

In the present case, the BIA considered the question of Singh's relocation, but because the burden was on Singh, it determined that Singh had "not demonstrated that he is unable to relocate within India or that relocation is unreasonable."  But, in *Singh*, 914 F.3d at 659, we emphasized that once a petitioner establishes past persecution, "the burden is on the government" to show that the petitioner "can reasonably relocate internally to an area of safety."  On remand, if Singh demonstrates past persecution, the BIA should "conduct a thorough, individualized analysis of [Singh's] ability to relocate internally, placing the burden on the government as required under *Singh*." *See Kaur*, 986 F.3d at 1231.  We caution that "an applicant cannot be said to have the ability to 'relocate' within [his] home country if [he] would have to remain in hiding there." *Akosung v. Barr*, 970 F.3d 1095, 1102 (9th Cir. 2020).

## C.  Withholding of removal

We now turn to Singh's request for withholding of removal.  A petitioner is entitled to withholding of removal if he can establish a "clear probability," *INS v. Cardoza-Fonesca*, 480 U.S. 421, 430 (1987), that his "life or freedom would be threatened" upon return because of a protected category, 8 U.S.C. § 1231(b)(3)(A).  Withholding's "clear-probability" standard is more stringent than asylum's well-founded-fear standard "because withholding of deportation is a mandatory form of relief." *Canales-Vargas*, 441 F.3d at 746.

If a petitioner establishes eligibility for asylum, he "raises a presumption of entitlement to withholding of deportation." *Id.* (citation omitted).  But an applicant who "fail[s] to satisfy the lower standard of proof required to

establish eligibility for asylum . . . necessarily . . . fail[s] to demonstrate eligibility for withholding." *Pedro-Mateo v. INS*, 224 F.3d 1147, 1150 (9th Cir. 2000) (citation omitted). Here, the BIA reasoned that "[t]he Immigration Judge's denial of the respondent's application for asylum on the merits is also fatal to the respondent's application for withholding of removal under the Act," so it did not reach the merits of Singh's withholding of removal claim. We remand the withholding-of-removal claim to the BIA so that it can determine whether Singh has established an asylum claim and thus benefits from a "presumption of entitlement to withholding of deportation." *See Canales-Vargas*, 441 F.3d at 746.

The government, however, argues that "the agency's relocation finding is a dispositive determination" and that we should uphold the BIA's asylum and withholding decisions because it determined that Singh could relocate within India. But we have consistently held that improperly placing the burden of proof on the petitioner once the petitioner has established past persecution constitutes error in a manner that warrants remand. *See, e.g.*, *Mashiri v. Ashcroft*, 383 F.3d 1112, 1123 (9th Cir. 2004) ("The IJ erred by placing the burden of proof on [the petitioner] rather than on the government."); *Vardanyan v. Barr*, 830 F. App'x 185, 189 (9th Cir. 2020) (holding that the BIA erred when it "improperly shifted the government's burden of establishing reasonableness to [the petitioner], who, as a result, was required to establish the unreasonableness of relocation"). We abide by this precedent in holding that the relocation determination is not dispositive, and we remand so that the BIA can consider whether Singh is entitled to the presumption given to those who have suffered from past persecution.

## D.  Convention Against Torture

This leaves Singh's claim for relief under CAT.   To assert this claim, Singh must establish that it is "more likely than not" that he will be tortured if removed to India.  *See Kamalthas v. INS*, 251 F.3d 1279, 1282 (9th Cir. 2001) (citing 8 C.F.R. § 208.16(c)(2)).  Singh must further show that any torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  *See* 8 C.F.R. § 208.18(a)(1)).

The regulations implementing CAT define torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him or her for an act he or she or a third person has committed or is suspected of having committed, . . . or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of, or with the consent or acquiescence of, . . . a public official acting in an official capacity or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1).

The CAT analysis does not follow the same pattern as the asylum and withholding analyses when the petitioner establishes past persecution.   Even if the petitioner demonstrates past persecution, the burden does not shift to the government in the analysis of a CAT claim.  *See Moldanado v. Lynch*, 786 F.3d 1155, 1163 (9th Cir. 2015)

("The regulations governing CAT deferral, unlike the asylum regulation, do not call for any burden shifting.").

Here, the IJ "independently" concluded that "the Court cannot find sufficient evidence in this record to conclude that the treatment amounted to torture."  The BIA in the present case concluded, based on "a review of the record," that "there is no clear error in the Immigration Judge's determination that [Singh] has not established that it is more likely than not that he will be tortured in India by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Relevant to the CAT analysis (but included in the asylum portion of the decision), the BIA also found that Singh could safely relocate within India and that the country reports did not substantiate Singh's fear of returning to India because they demonstrated only a fear based on general, rather than individualized, conditions.

Taken together, the IJ's and BIA's findings that Singh did not suffer past torture and was not likely to suffer future torture were supported by substantial evidence.  *See Fon*, 34 F.4th at 816 (finding that the record compelled a finding of past persecution, but concluding that substantial evidence supported the BIA's determination that a petitioner failed to show that it is more likely that not that he would be tortured). We therefore deny the petition as to CAT relief.

## III.    CONCLUSION

For all of the reasons set forth above, we **GRANT** Singh's petition in part, **DENY** Singh's petition in part, and **REMAND** to the BIA for further proceedings consistent with this opinion.

MILLER, Circuit Judge, concurring:

When the Board of Immigration Appeals has determined that the harm an alien suffered was not sufficiently severe to constitute persecution, we have sometimes treated that determination as a factual finding and sometimes as a legal conclusion. The appropriate standard of review in that context implicates both intra-circuit and inter-circuit conflicts, and, as Judge Collins has observed, "our caselaw on this subject is a bit of a mess." *Fon v. Garland*, 34 F.4th 810, 823 (9th Cir. 2022) (Collins, J., concurring). I share Judge Collins's view that "the en banc court should take up these issues in an appropriate case" if the Supreme Court does not do so first. *Id.*; *see also id.* at 819 (Graber, J., concurring).

Whatever the standard of review, however, our precedent establishes rules that govern our decisions in cases involving similar facts. Our dissenting colleague faults the court for setting aside the Board's decision even though it reflected what the dissent calls "a reasonable interpretation of our precedent," if perhaps not the best interpretation of that precedent. I fully agree that many of our cases in this area—including some of those that dictate today's decision—have reflected insufficient deference to the Board. But whether we like them or not, our cases are what they are, and it is up to this court, not the Board, to say what they mean. We must defer to the Board's factual findings, *see* 8 U.S.C. § 1252(b)(4)(B), as well as, in certain cases, to its interpretation of the statute, *see Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984); *Route v. Garland*, 996 F.3d 968, 975 (9th Cir. 2021) (holding that *Chevron* deference does not extend to most of the Board's unpublished decisions). But a court "gives no deference to

an agency's interpretation of judicial precedent." *SFPP, L.P. v. FERC*, 967 F.3d 788, 795 (D.C. Cir. 2020) (per curiam); *accord University of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002); *Akins v. FEC*, 101 F.3d 731, 740 (D.C. Cir. 1996) (en banc) (observing that there is "no reason for courts—the supposed experts in analyzing judicial decisions—to defer to agency interpretations of the Court's opinions"), *vacated on other grounds*, 524 U.S. 11 (1998). And to say, as our dissenting colleague does, that the Board's decision must be upheld "unless our precedent would compel any reasonable adjudicator to conclude the contrary" is to conflate the Board's factual findings (which we review deferentially) with its application of the legal rules established by our precedent (which we do not).

As the court's opinion explains, our cases in this area permit no conclusion other than that the harm that Singh suffered constituted persecution. To be sure, there are many cases in which we have upheld findings of no persecution. Perhaps the most helpful case for the Board is *Hoxha v. Ashcroft*, but that case involved an isolated incident, not a pattern of harm. 319 F.3d 1179, 1182 (9th Cir. 2003) ("The one incident of physical violence against Hoxha was not connected with any particular threat."); *see Chand v. INS*, 222 F.3d 1066, 1073 (9th Cir. 2000) (noting the significance of a pattern of "harm on more than one occasion").

Here, the most closely analogous cases are *Flores Molina v. Garland*, 37 F.4th 626 (9th Cir. 2022), and *Aden v. Wilkinson*, 989 F.3d 1073 (9th Cir. 2021). Of course it is possible to identify factual differences among the cases. For example, Flores Molina was forced to flee his home under somewhat more difficult circumstances than Singh, was publicly identified and targeted, was threatened slightly more frequently, and was subjected to different country

conditions. Aden, likewise, received threats not only to himself but also to his family, suffered more serious injuries, and came from a country with somewhat different conditions. But nothing in the reasoning of the opinions in *Flores Molina* and *Aden* suggests that those differences should matter. At bottom, those cases and this one involve fundamentally the same story: The alien was targeted multiple times for his political views, threatened (including with a death threat), assaulted (leaving non-severe physical wounds), and forced to flee his home. Unless we are to overrule those cases—and, as three-judge panel, we are unable to do so—there is no principled basis for reaching a different result here.

IKUTA, Circuit Judge, dissenting:

A determination by the Board of Immigration Appeals (BIA) that an alien is not entitled to asylum must be upheld unless a reasonable factfinder would be *compelled* to conclude to the contrary. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *see also* 8 U.S.C. § 1252(b)(4)(B). Based on that standard, we may not reverse the BIA's determination that Shamsher Singh's testimony did not demonstrate that he suffered persecution.

But the majority today "flips this standard on its head," *Garland v. Ming Dai*, 141 S.Ct. 1669, 1678 (2021). Instead of deferring to the BIA's determination "as one of potentially many reasonable possibilities," *id.*, the majority claims the BIA's decision is contrary to our precedent. But our precedent encompasses wide-ranging views of what constitutes persecution. A fair review of our cases shows

that the majority reaches its conclusion only by cherry-picking similar facts in cases where we reversed the BIA, and distinguishing similar facts in cases where we upheld the BIA's conclusion.  Because the Supreme Court has told us to  respect the BIA's case-by-case application of legal standards to the facts, and to reverse the BIA's conclusion only if no reasonable adjudicator could have reached that result, I dissent from the majority's improper approach and conclusion.

I

The Immigration and Nationality Act (INA) gives the Attorney General discretion to grant asylum to a refugee, which the statute defines as an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42). We have defined persecution as "an extreme concept that means something considerably more than discrimination or harassment."  *Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2021) (cleaned up); *see also Duran-Rodriguez v. Barr*, 918 F.3d 1025, 1028 (9th Cir. 2019).

Notwithstanding our confusing case law, *see* Maj. at 15–16, the Supreme Court has been clear about the standard for reviewing the BIA's determination that an applicant for asylum did not show "persecution or a well-founded fear of persecution on account of" a protected ground.  *See Elias-Zacarias*, 502 U.S. 478 (1992).  In *Elias-Zacarias*, the agency determined that an alien's rejection of an attempt by guerillas to recruit him did not demonstrate persecution or a well-founded fear of persecution on account of a protected ground.  We disagreed and granted the alien's petition,

ruling that "acts of conscription by a nongovernmental group constitute persecution on account of political opinion" and that the alien had a "well-founded fear" of such recruitment. *Id.* at 481.

The Supreme Court reversed, holding that we erred both in our interpretation of the INA and in our failure to apply the correct standard of review. As to the standard of review, the Court explained that a court must uphold "[t]he BIA's determination that the alien was not eligible for asylum" so long as that determination was supported by substantial evidence, which meant that a court could reverse the BIA's determination only if the evidence presented by the alien "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* at 481.[1] In other words, to reverse the BIA, the alien would have to show that the record "compels the conclusion" that the legal standard is met. *Id.* at 483. But the evidence in *Elias-Zacarias* did not compel the conclusion that the alien held a political opinion or had "a 'well-founded fear' that the guerillas would persecute him *because of* that political

---

[1] At the time the Supreme Court ruled, the statute provided that the agency's determination had to be upheld if "supported by reasonable, substantial, and probative evidence on the record, considered as a whole." 8 U.S.C. § 1105a(a)(4) (1991). This language was subsequently replaced by the INA's current language, stating that the agency's "findings of fact must be upheld unless any reasonable adjudicator would be compelled to conclude the contrary." 8 U.S.C. § 1252(b)(4)(B). These standards are the same. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020) (defining "the substantial-evidence standard" to mean "[t]he agency's 'findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary'" (citing § 1252(b)(4)(B)).

opinion" with the requisite "degree of clarity necessary to permit reversal of a BIA finding to the contrary." *Id.*[2]

Before *Elias-Zacarias*, the Supreme Court had recognized a different aspect of the deferential standard of review for the BIA's application of a legal standard to the facts. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987). Here the Court explained, "[t]here is obviously some ambiguity in a term like 'well-founded fear' which can only be given concrete meaning through a process of case-by-case adjudication." *Id.* And "[i]n that process of filling any gap left, implicitly or explicitly, by Congress, the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." *Id.* (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843 (1984)). Therefore, it is advisable that courts not "set forth a detailed description of how" a particular legal standard should be applied. *Id.* Reading *Cardoza-Fonseca* together with *Elias-Zacarias*, we are to give *Chevron* deference to the BIA's determination of how a legal standard (such as the asylum standard for well-founded fear of persecution) applies to the

---

[2] The Court also corrected our interpretation of the law. We had reasoned that "a guerrilla organization's attempt to conscript a person into its military forces necessarily constitutes 'persecution on account of . . . political opinion,' because 'the person resisting forced recruitment is expressing a political opinion hostile to the persecutor and because the persecutors' motive in carrying out the kidnapping is political.'" *Elias-Zacarias*, 502 U.S. at 481. In rejecting our interpretation of the INA, the Court held first that a guerilla's recruitment efforts do not "necessarily" constitute persecution on account of political opinion because a person may resist recruitment for a variety of reasons, and then held that in determining whether the alien has suffered persecution on account of political opinion only the alien's views, not the persecutor's, are relevant. *Id.* at 481–82.

facts of a new case, even if we would have reached a different conclusion.

While our review of the BIA's application of a legal standard to the facts is circumscribed, we still retain the final authority to correct errors of law.  For instance, if a court "employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."  *Id.*  In this vein, we have reversed the BIA if it applied the wrong standard of review, *see Rodriguez v. Holder*, 683 F.3d 1164, 1169–70 (9th Cir. 2012), "misstate[ed] the record [or] fail[ed] to mention highly probative or potentially dispositive evidence," *Castillo v. Barr*, 980 F.3d 1278, 1283 (9th Cir. 2020), or provided insufficient explanation to show that it conducted "an individualized review of the petitioner's circumstances," *Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir. 1995).

We have not had an easy time in discerning the line between proper deference to the BIA's adjudication of specific cases and discharging our responsibility to decide "narrow legal questions," *Cardoza-Fonseca*, 480 U.S. at 448.  Thus, notwithstanding the agency's responsibility for giving the term "persecution" concrete meaning through case-by-case decisionmaking, we have frequently weighed in on this issue. *See, e.g.*, *Flores Molina v. Garland*, 37 F.4th 626, 633–37 (9th Cir. 2022); *Sharma*, 9 F.4th at 1061–63. Our rulings as to when facts satisfy the legal standard of past or future persecution are binding on both us and the BIA, *see Silva v. Garland*, 993 F.3d 705, 717 (9th Cir. 2021), and therefore provide guidance as to what a reasonable jurist may consider compelling evidence of past persecution. *See Singh v. INS*, 134 F.3d 962, 967–68 ("This inquiry . . . is

perhaps best answered by comparing the facts of Petitioner's case with those of similar cases.").

Nevertheless, our precedents on this issue cannot be applied as mechanical rules.  Because applicants for asylum relief present a boundless variety of individual circumstances, "[t]he determination that actions rise to the level of persecution is very fact-dependent," *Cordon-Garcia v. INS*, 204 F.3d 985, 991 (9th Cir. 2000), and this analysis "is not reducible to a set formula" or bright-line rules. *Sharma,* 9 F.4th at 1061.  Indeed, the Supreme Court has warned against imposing such rules on the BIA.  In *Elias-Zacarias*, the Supreme Court rejected our per se rule that a guerilla's recruitment effort "*necessarily constitutes* 'persecution on account of . . . political opinion." 502 U.S. at 481.  And in *Garland v. Ming Dai*, the Supreme Court struck down our "special rule" that a reviewing court must treat an alien's testimony as credible in the absence of an adverse credibility determination by the agency.  141 S. Ct. 1669, 1674, 1677 (2021).

Therefore, although the BIA may be guided by the legal framework we have developed, it is not bound by any hard-and-fast "special rule."   The BIA is permitted to weigh evidence differently than we might, such as by giving more weight to one aspect of a petitioner's testimony or experiences than to another. *See id.* at 1678*.*  And the agency retains broad discretion to weigh the  "persuasiveness and legal sufficiency" of facts in the record.  *Id.* at 1681. Therefore, when the BIA determines that the full picture offered by the alien is not so severe as to amount to persecution, we must defer to this conclusion unless it is such an extreme outlier among our precedents that it cannot be reasonably reconciled with them. *See Duran-Rodriguez*, 918 F.3d at 1028.

## II

In this case, our precedent does not establish that any reasonable fact-finder would be compelled to overturn the BIA's conclusion that Shamsher Singh failed to carry his burden of proving the treatment he suffered in India rose to the level of persecution. *See Khourassany v. INS*, 208 F.3d 1096, 1100 (9th Cir. 2000); *see also* 8 U.S.C. § 1252(b)(4)(B).

The BIA considered the following evidence in the record. Singh testified that his brother, Harpreet, joined the Mann Party in December 2016. Members of the Congress Party attacked Harpreet twice, in April 2017 and August 2017, causing him "some internal injuries."[3] Harpreet then fled to the Untied States. In 2017, members of the Congress Party asked Singh where his older brother was and told him that he and his brother should join the Congress Party.

Singh was beaten twice. The first time, four men punched and kicked him and he suffered "pain in [his] stomach." His mother gave him herbal remedies, and he sought no further medical treatment. The second time, five men beat him with hockey sticks, told him that they were going to kill him "now," and stopped their attack only after nearby farmers arrived. Singh suffered "small bruises, scratches, blue marks and some part of swollen body." A village doctor gave him pain medication and bandages and advised him to rest in bed. Attackers beat Singh's brother

---

[3] The majority states that Singh testified that he suffered "serious internal injuries," Maj. at 10, but cites no basis in the record for calling them "serious." *Cf. Elias-Zacarias*, 502 U.S. at 816 n. 2 (criticizing the dissent for misdescribing the record to enhance the "'well foundedness' of whatever fear [the alien] possesses, by progressively transforming his testimony").

for the same political involvement.  Finally, a Mann Party member represented that there is ongoing violence against members of Singh's political group in the relevant region.

The BIA determined that "considering all of the harm that [Singh] experienced cumulatively in the totality of the circumstances," including the lack of any serious physical injuries, Singh "has not demonstrated that the harm he experienced rises to the level of persecution."  In reaching this conclusion, the BIA cited Ninth Circuit cases upholding the agency's finding of no past persecution in analogous circumstances.

The BIA's determination was not so far outside a reasonable interpretation of our precedent as to compel a different conclusion.  First, as the majority acknowledges, Maj. at 23, there is no precedent directly on point.  Rather, our precedents describe a range of situations that include some but not all of Singh's experiences, and which resulted in differing decisions, some upholding and some reversing the BIA's determination.[4]

---

[4] The concurrence states that we do not defer "to an agency's interpretation of judicial precedent," relying on several D.C. Circuit opinions.  Concur. at 32–33.  One rejected an agency order under the arbitrary and capricious standard, *SFPP, L.P. v. FERC*, 967 F.3d 788, 795 (D.C. Cir. 2020), *cert. dismissed*, 141 S. Ct. 2170 (2021), making it irrelevant to this case.  The others, stating that courts are not obligated to defer to agency interpretations of judicial decisions, *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002); *Akins v. FEC*, 101 F.3d 731, 740 (D.C. Cir. 1996) (en banc), *vacated on other grounds*, 524 US. 11 (1998), are equally inapt.  The BIA is not interpreting our precedent here.  Rather, it is making a fact-specific determination of whether the actions in this case rise to the level of "persecution" under the INA.  Under the substantial evidence standard, which is applicable in this context, we must uphold this determination unless our precedent would

We have upheld the BIA's finding of no past persecution in cases involving treatment that was in some ways more severe than that alleged by Singh. In *Prasad v. INS*, 47 F.3d 336 (9th Cir. 1995), the petitioner was "taken to a police station," "placed in a jail cell," "hit on his stomach and kicked from behind," and threatened with being arrested and beaten again. 47 F.3d at 339. In *Duran-Rodriguez v. Barr*, the petitioner was threatened with death twice in two days. 918 F.3d at 1028–29. In *Halim v. Holder*, 590 F.3d 971(9th Cir. 2009), the petitioner was variously stripped naked, spat on and threatened, refused service at a health clinic, falsely arrested by police, and beaten by a mob of rioters over the course of roughly ten years. 590 F.3d. at 975–76. In *Gu v. Gonzales*, 454 F.3d 1014 (9th Cir. 2006), the petitioner was imprisoned by police for three days and beaten with a rod. 454 F.3d at 1018. In *Hoxha v. Ashcroft*, 319 F.3d 1179 (9th Cir. 2003), the petitioner suffered "extensive facial bruises and two broken ribs" and was threatened with death. 319 F.3d at 1181. In *Lim v. INS*, 224 F.3d 929 (9th Cir. 2000), the petitioner received a long series of death threats over the course of several years, and three of his colleagues were murdered. 224 F.3d 929 at 932–35. In *Sharma*, police officers "beat" and "slapped" the petitioner, "apparently with a baton," and held him in a room where they "beat[ ],

---

compel any reasonable adjudicator to conclude the contrary. *See* 8 U.S.C. § 1252(b)(4)(B). Contrary to the concurrence, Concur. at 32, we review the BIA's determination as to whether facts in the record meet the standard set forth in the INA under the substantial evidence standard. *See, e.g.*, *Elias-Zacarias*, 502 U.S. at 481 n.1 (instructing that to reverse a BIA finding that a petitioner has not been persecuted on account of his political opinion a court "must find that the evidence not only supports" a conclusion that the petitioner's refusal to join a guerilla group constituted the statement of a political opinion "but compels it").

slap[ped], and shove[d] him throughout the night." 9 F.4th at 1063 (alterations in original). Based on this guidance, the BIA could reasonably conclude that Singh's treatment, which was not as severe as some of these examples, did not constitute persecution.

The majority argues that we may not rely on these opinions, however, because there are facts in each of these cases that make them distinguishable from the situation in Singh's case. Maj. at 21. For example, the majority contends that Hoxha's severe beating and death threat were offset by the fact that the beating itself "was not connected with any particular threat" and his attackers did not appear to know him. Maj. at 22. *See Hoxha*, 319 F.3d at 1182. And the majority brushes off Gu's three days of imprisonment and violent interrogation at the hands of police as 'one brief' episode. Maj. at 23. *See Gu*, 454 F.3d at 1020–21. Of course, there will always be factual distinctions between different cases, such as the number of assaults, the precise context of those assaults, the presence and severity of threats, and the span of time over which the mistreatment took place. But such distinctions do not make those precedents irrelevant or make it unreasonable for the BIA to rely on them along with other precedents. Nor is it disqualifying that "[n]one of these cases involve multiple instances of physical violence coupled with a death threat," a point emphasized by the majority, Maj. at 21. Indeed, to the extent the majority is suggesting that two violent instances and a death threat constitute persecution *as a matter of law*, it is antithetical to our "carefully circumscribed" role. *Ming Dai*, 141 S. Ct. at 1677. The INA does not define "persecution," and this inquiry "is not reducible to a set formula." *Sharma*, 9 F.4th at 1061; *see also Singh*, 134 F.3d at 967–68. Such a rule would be

exactly the kind of "embellishment" we may not impose on the BIA. *Ming Dai*, 141 S. Ct. at 1677.

By the same token, the two precedents on which the majority most heavily relies are equally distinguishable from Singh's case. *See Aden v. Wilkinson*, 989 F.3d 1973 (9th Cir. 2021); *Flores Molina*, 37 F.4th 626. But the majority fails to acknowledge this fact. Instead, once it turns to these favorable precedents, its approach changes dramatically. In its new posture, the majority emphasizes only details that it portrays as similar or less severe than Singh's case, and it glosses over every detail that is plainly more severe.

In *Aden*, the applicant for asylum testified that men ordered Aden and his brother to shut down their movie theater, raided the theater with guns, struck the petitioner in the head with the butt of a rifle "causing him to bleed profusely," and stole the theater's equipment. 989 F.3d at 1077. On a later occasion, the men beat Aden and his brother with wooden sticks and robbed them. *Id.* at 1078. On a third occasion, two men with guns threatened to kill Aden and robbed him. *Id.* Two weeks later, a man called Aden's brother and warned him that if he reopened the theater, both brothers would be killed. *Id.* at 1077–78. The majority grasps at the similarities between *Aden* and Singh's case, such as the fact that the assailants in both cases targeted the victims and followed them from location to location. But the majority ignores the distinctions between these cases. The incidents in *Aden* were more severe than in Singh's case, because Aden was attacked, robbed, or threatened with death on four occasions, as opposed to Singh's two. Moreover, Aden bled profusely from the head when struck with a rifle butt, which is more severe than the "small bruises" and other injuries Singh sustained.

In *Flores Molina*, assailants including government operatives and government-aligned paramilitary members, came to Flores-Molina's home with assault rifles. 37 F.4th at 631. The assailants doggedly pursued Flores-Molina to his home and to two subsequent hiding places, threatening or assaulting him each time. *Id.* Further, Flores Molina was subjected to a long series of detailed public threats posted publicly to the internet by government operatives and sent to him directly via WhatsApp. *Id.* These threats escalated and culminated in two death threats. The threat "Bullets to Strikers" was painted on his house, and "at the next encounter" the assailants stated "we're going to kill you" during a beating. *Id.* at 630–31. This beating caused Flores Molina to lose a tooth and left scarring on his lip. *Id.* at 631. Flores Molina sought medical attention at a hospital, but the entrance was blocked by police and paramilitary members, and he was unable to enter. *Id.* Finally, Flores Molina participated in protests where "police and paramilitary members regularly shot at, wounded and killed demonstrators." *Id.* at 630. He witnessed assailants murdering his friend at a demonstration. The country conditions reports showed that between April and July 2018, "it was estimated that over 300 protestors [aligned with Flores Molina] were killed by the police and government operatives." *Id.*

Again, the majority notes the similarities to Singh's case: neither alien suffered life-threatening physical injuries. But again, the majority ignores important distinctions. The incidents in *Flores Molina* were more severe than those reported by Singh, in that Singh received far fewer threats overall, and he received only a single death threat, rather than two. The assailants who threatened Singh were not government operatives, and their only weapons were hockey

sticks, as opposed to assault rifles. Singh was never confronted or threatened by a government operative or with a gun. And unlike Flores Molina, Singh suffered no lasting injuries. Finally, the turmoil in Singh's country (India) was less severe than that in Flores-Molina's country (Nicaragua). Singh alleged that his brother was attacked by members of the Congress Party, and a Mann Party representative stated that the government had injured, jailed and killed Sikhs in 2015. In *Flores Molina*, by contrast, the police and government operatives had recently killed hundreds of protestors aligned with Flores Molina in the previous year, including at protests Flores Molina attended. 37 F.4th at 630–31.

This is not to say that *Aden* and *Flores Molina* are irrelevant; they likewise provide guidance in reviewing the BIA's opinion. But neither do they resolve the question whether the incidents described by Singh amount to persecution. Rather, reasonable minds could differ as to how our full body of precedents apply in this case. Our task is merely to determine whether the BIA's decision is so contrary to our case law that no reasonable factfinder could have reached the same conclusion; we do not have the authority to decide the case in the first instance, as if we were directly applying our case law to the facts at hand. Moreover, we must respect the BIA's process of giving meaning to the term "persecution" through its case-by-case adjudication. *Cardoza-Fonseca*, 480 U.S. at 448. The majority therefore errs in weighing the similarities and differences between our precedents in this case and "giv[ing]

conclusive weight" to any fact that "cuts against the agency's finding." *Ming Dai*, 141 S. Ct. at 1678.[5]

In short, the only question before us is whether the BIA's determination that Singh did not suffer persecution compels *any* reasonable factfinder to disagree, and "to conclude that the requisite fear of persecution existed." *Elias-Zacarias*, 502 U.S. at 481. Because the BIA's determination here "qualifies as one of potentially many reasonable possibilities" for deciding this issue, *Ming Dai*, 141 S. Ct. at 1678, I would deny the petition. For these reasons, I dissent.

---

[5] The concurrence commits the same error. It concedes that *Aden* and *Flores Molina* are factually distinguishable from this case, but reasons that these factual differences do not matter because "those cases and this one involve fundamentally the same story." Concur. at 34. But the concurrence fails to discuss other precedents where we upheld the agency's finding of no persecution. *See supra* at 10–11. For instance, *Hoxha* and this case could also be said to "involve fundamentally the same story." In *Hoxha*, the alien was threatened (including with a death threat) and suffered physical violence. *See Hoxha*, 319 F.3d at 1181. Like the majority, the concurrence ignores similarities in cases that upheld the agency while focusing on similarities in cases that reversed the agency. Neither the majority nor the concurrence justifies this inconsistent approach to our precedents.